David S. Elkins (State Bar # 148077)
david.elkins@squirepb.com
Joseph P. Grasser (State Bar # 255156)
joseph.grasser@squirepb.com
Amanpreet Kaur (State Bar # 271782)
amanpreet.kaur@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California  94304
Telephone:     +1 650 856 6500
Facsimile:     +1 650 843 8777

Attorneys for Plaintiffs and Counterclaim
Defendants VENTURE CORPORATION LTD and
VENTURE DESIGN SERVICES, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VENTURE CORPORATION LTD and VENTURE DESIGN SERVICES, INC., | Case No. CV 13-03384 PSG (ADR) |
| Plaintiff, | **VENTURE CORPORATION LTD'S AND VENTURE DESIGN SERVICES, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | |
| JAMES P. BARRETT, | |
| Defendant. | Date:   November 25, 2014 |
| | Time:  10:00 a.m. |
| And Related Counterclaim | Place:  Courtroom 5 - 4th Floor |
| | The Honorable Paul Singh Grewal |

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on November 25, 2014 at 10:00 a.m., or on any date thereafter at the Court's convenience, before the Honorable Paul Singh Grewal in Courtroom 5 of the above-referenced Court located at 280 S. First Street, San Jose, CA 95113, plaintiffs and counterclaim defendants Venture Corporation Ltd. ("VCL") and Venture Design Services, Inc. ("VDSI") (collectively "Plaintiffs" or "Venture") will and hereby do move the Court, pursuant to Federal Rule of Civil Procedure 56, for summary judgment in favor of Plaintiffs and against defendant James P. Barrett ("Barrett") on Plaintiffs' declaratory judgment claims [Dkt. No. 6] and on Barrett's counterclaims [Dkt. No. 38] (which would render Plaintiffs' counterclaim-in-reply moot [Dkt. No. 41]).  Plaintiffs are entitled to summary judgment because the undisputed facts reflect that Barrett had and has no ownership interest in the patent-in-suit and the two published patent applications-in-suit as a matter of law.  As a result, Barrett's counterclaims – all of which rest on his contention that he is the rightful owner of the patent and patent applications – fail as a matter of law.

Plaintiffs' motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities that follows, the concurrently filed Declarations of Lee Ghai Keen and Joseph P. Grasser and their respective exhibits, any reply memorandum that may be filed, the records and files in this action, and on the arguments of counsel.

Dated: October 21, 2014                    SQUIRE PATTON BOGGS (US) LLP

                                           By: /s/ *Joseph P. Grasser*
                                               David S. Elkins
                                               Joseph P. Grasser

                                           Attorneys for Plaintiffs and
                                           Counterclaim Defendants
                                           VENTURE CORPORATION LTD and
                                           VENTURE DESIGN SERVICES, INC.

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION .................................................................................................. 1

II.     SUMMARY OF ARGUMENT ............................................................................. 2

III.    STATEMENT OF UNDISPUTED FACTS ........................................................... 4

    A.    Barrett Accepts Employment with VDSI Pursuant to the Terms of The Inventions Agreement ................................................................................ 4

    B.    The Inventions Agreement Provides, Inter Alia, That Any Concept On Which Barrett Works During His Employment Is Assigned to VDSI................... 4

    C.    While Employed by VDSI, Barrett Worked on the Inventions with his VDSI Co-Worker and then He Disclosed the Same "Per" the Inventions Agreement ...................................................................................................... 6

    D.    Barrett Contemporaneously Admits in Writing That He Conceived of and Worked on the Inventions During his Employment with VDSI ......................... 8

    E.    Neither Product of the Purported Joint Venture Has Been Profitable ................. 10

IV.     DISCUSSION ...................................................................................................... 12

    A.    Summary Judgment Standard ....................................................................... 12

    B.    California, Not Washington, Law Governs This Motion.................................... 13

    C.    Barrett Cannot Own Any of the Pending Patents and Patent At Issue Because He Created These Inventions As An Employee of VDSI...................... 14

        1.    Because Barrett Disclosed the Inventions "Per" the Agreement And Worked On And Developed the Inventions While an Employee, They Were Assigned to VDSI.................................................................. 15

        2.    The Inventions Do Not Come Within the Exception Created by Labor Code Section 2870.................................................................. 16

            a.    Barrett and Other VDSI Employees Used VDSI's Resources to Develop the Inventions……………………………………………..16

            b.    The Inventions Relate to VDSI's Business and Its Anticipated Areas of Research……………………………………………………17

        3.    Barrett's Alleged "Joint Venture" Is an Impermissible Modification of the Inventions Agreement .................................................................. 18

        4.    Because Venture Always Owned the Inventions, Barrett's Claims Fail ...................................................................................................... 19

    D.    Barrett's Claims Fail Because He Cannot Prove Damages ................................. 19

        1.    Barrett's Claim for Damages for the MineTracer Product Fails Because that Product Never Generated Net Profits ................................. 21

        2.    Barrett's Claim for Damages for RLS Fails Because It Has Never Even Sold, Let Alone Generated Net Profits ........................................... 22

        3.    Barrett's Damages Claims Fail for Lack of Expert Testimony................. 24

V.      CONCLUSION..................................................................................................... 25

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alpine Indus., Inc. v. Gohl,*
   30 Wash. App. 750, 637 P.2d 998, 1001 (1981), *opinion changed,* 645 P.2d
   737 (Wash. App. 1982) ...................................................................................................24

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ......................................................................................................12

*Berg v. Kincheloe,*
   794 F.2d 457 (9th Cir. 1986).........................................................................................12

*Brewer v. Indymac Bank,*
   609 F. Supp. 2d 1104 (E.D. Cal. 2009)...................................................................19, 20

*Brother Records v. Jardine,*
   318 F.3d 900 (9th Cir. 2003).........................................................................................22

*Cadence Design Sys., Inc. v. Bhandari,*
   Case No. C 07-00823 MHP, 2007 U.S. Dist. LEXIS 83078 (N.D. Cal. Nov. 8,
   2007) .....................................................................................................................5, 16, 17

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986).................................................................................................12, 13

*Clear Channel Outdoor, Inc. v. Bently Holdings Cal. LP,*
   No. C-11-2573 EMC, 2011 U.S. Dist. LEXIS 140764 (N.D. Cal. Dec. 7, 2011) .............19, 20

*Cubic Corp v. Marty,*
   185 Cal. App. 3d 438 (1986).....................................................................................17, 18

*Erlich v. Menezes,*
   21 Cal. 4th 543 (1999) ..............................................................................................2, 19

*Food Safety Net Services v. Eco Safe Systems USA, Inc.,*
   209 Cal. App. 4th 1118 (2012).....................................................................................22

*Graham-Sult v. Clainos,*
   756 F.3d 724 (9th Cir. 2014)....................................................................................19, 20

*Gravquick A/S v. Trimble Navigation Int'l,*
   323 F.3d 1219 (9th Cir. 2003)......................................................................................14

*Greenwich S.F., LLC v. Wong,*
   190 Cal. App. 4th 739 (2010)...................................................................................21, 23

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

PLAINTIFFS' MEMO. ISO MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 13-03384 PSG (ADR)

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Hatfield v. Halifax PLC*,
 564 F.3d 1177 (9th Cir. 2009) ........................................................................13, 14

*Hathaway Dinwiddie Constr. Co. v. United Air Lines, Inc.*,
 50 Fed. Appx. 817 (9th Cir. 2002) ...............................................................................24

*Hernandez v. Spacelabs Med. Inc.*,
 343 F.3d 1107 (9th Cir. 2003) ......................................................................................12

*Iconix, Inc. v. Tokuda*,
 457 F. Supp. 2d 969 (N.D. Cal. 2006) ..........................................................................16

*Keenan v. Allan*,
 91 F.3d 1275 (9th Cir. 1996) ........................................................................................13

*Kids' Universe v. In2Labs*,
 95 Cal. App. 4th 870 (2002) ...................................................................................22, 24

*Maggio, Inc. v. UFW*,
 227 Cal. App. 3d 847 (1991) ..................................................................................20, 23

*Mail Boxes Etc., USA, Inc. v. Considine*,
 2000 U.S. App. LEXIS 16185 (9th Cir. 2000) (applying Washington and
 California law, which both support enforcing choice of law provisions, to
 enforce ambiguous controlling law provision and determining that California
 law applied pursuant to either set of choice of law rules) .............................................14

*Marani v. Jackson*,
 183 Cal. App. 3d 695 (1986) ........................................................................................18

*Martinez v. Welk Group, Inc.*,
 907 F. Supp. 2d 1123 (S.D. Cal. 2012) ..................................................................19, 20

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
 475 U.S. 574 (1986) ......................................................................................................12

*Milgard Tempering v. Selas Corp. of Am.*,
 902 F.2d 703 (9th Cir. Wash. 1990) .............................................................................24

*Parlour Enterprises, Inc. v. Kirin Group, Inc.*,
 152 Cal. App. 4th 281 (2007) .................................................................................21, 23

*Patton v. Royal Industries, Inc.*,
 263 Cal. App. 2d 760 (1968) ........................................................................................23

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

- iii -

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Peoples Bank v. Bluewater Cruising LLC*,
   Case No. C12-00939RSL, 2014 U.S. Dist. LEXIS 6428 (W.D. Wash. Jan. 17,
   2014) .......................................................................................................................24

*Piscitelli v. Friedenberg*,
   87 Cal. App. 4th 953 (2001).................................................................................20

*Planet Goalie, Inc. v. Monkeysports, Inc.*,
   CASE NO. CV 11-07263 RZ, 2013 U.S. Dist. LEXIS 57499 (C.D. Cal. Apr.
   22, 2013) .............................................................................................................19, 25

*Sargon Enterprises, Inc. v. University of Southern California*,
   55 Cal. 4th 747 (2012) ..........................................................................................21

*Soremekun v. Thrifty Payless, Inc.*,
   509 F.3d 978 (9th Cir. 2007)..................................................................................13

*Surrell v. Cal. Water Serv. Co*.,
   518 F.3d 1097 (9th Cir. 2008)................................................................................12

*Tyrone Pacific International, Inc. v. MV Eurychili*,
   658 F.2d 664 (9th Cir. 1981)..................................................................................20

*Vacchiano v. Wessell*,
   Case No. CV 12-2003 DSF, 2014 U.S. Dist. LEXIS 39554 (C.D. Cal. Mar. 24,
   2014) ..................................................................................................................19, 20

*Vestar Dev. II, LLC v. Gen. Dynamics Corp*.,
   249 F.3d 958 (9th Cir. 2001)..............................................................................23, 24

**Statutes**

Cal. Civ. Code § 3300...................................................................................................2

Cal. Lab. Code § 2870.......................................................................................... *passim*

Wash. Rev. Code § 49.44.140.......................................................................................5

**Other Authorities**

Fed. R. Civ. P. 56(a).....................................................................................................12

Fed. R. Civ. P. 56(e).....................................................................................................13

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

- iv -

1

## I.     INTRODUCTION

Summary judgment should be entered in Plaintiffs' favor and against Barrett on all claims and counterclaims.  Barrett is a former paid employee of VDSI.  As a condition of employment he prospectively agreed to assign to VDSI all inventions created, developed, or worked on (1) in the course of or related to his employment or (2) using company resources.

After Venture moved to dismiss Barrett's initial counterclaims, he alleged in his Amended Counterclaim that he conceived of inventions at issue before VDSI employed him in 2003. Barrett contends that two years after his employment commenced, he approached Venture with an idea for exploiting "his" inventions.  According to Barrett, VCL – VDSI's corporate parent – and Barrett entered into a "joint venture" in which Barrett contributed his "inventions,"[1] VCL contributed money to develop products based on the inventions, and that VCL and Barrett would share the resulting profits.  The alleged joint venture agreement is oral; Barrett admits that no memo, letter, email, piece of scratch paper or other contemporaneous writing reflects such a joint venture.[2]  Barrett contends that VCL and VDSI have breached this oral agreement by not sharing the profits of the mining systems based on the inventions at issue.

The undisputed facts reflect that Barrett and other VDSI employees developed and productized the three mining-related inventions that Barrett is credited with having conceived. By virtue of Barrett's invention assignment agreement, VDSI automatically owned each invention – and the corresponding patent rights – as a matter of law.  Barrett's contention that he "contributed" his inventions to a purported joint venture with his employer's corporate parent thus fails: Barrett's purported "contribution" of property he did not own was illusory.  Venture is entitled to summary judgment on its declaratory judgment claims and on Barrett's counterclaims.

---

[1] "Inventions" refers to three systems known as the "MineTracer," U.S. Patent no. 8,294,568; a "Toxic Gas Removal and Air Conditioning System for Human Life Support in Enclosed Refuge Spaces" (the "Gas Scrubbing" system), U.S. Patent Application No. US2012/0304866A1; and a "Gas Monitoring System with Oxygen Control for Human Life Support in Enclosed Refuge Space" (the "Gas Monitoring" system), U.S. Patent Application No. US2013/0153060A1.

[2] Though expressly unnecessary as support for this Motion, there is no writing memorializing this purported agreement because there never was a joint venture.  (Declaration of Lee Ghai Keen in Support of Motion for Summary Judgment at ¶¶ 11-12.) ("Lee Decl.").

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

1   Barrett's counterclaims fail for a second, independent reason:  he has not been damaged.

2   Even assuming arguendo that some joint venture was created, the undisputed facts demonstrate

3   that the Inventions that VDSI developed are deeply in the red; none have earned a profit.  Put

4   simply, even if Barrett's tale were true, the absence of any profits to share means he has not

5   suffered any harm.  Because Barrett cannot show the fact of damage – let alone any credible

6   amount of damages – Plaintiffs are entitled to summary judgment on Barrett's counterclaims.

7   ## II.   SUMMARY OF ARGUMENT

8   The dispute at the heart of this action concerns rightful ownership of a U.S. patent and two

9   pending, published U.S. patent applications.  As a condition of his employment, Barrett signed an

10  Employee Confidential Information and Inventions Agreement (the "Inventions Agreement"),

11  prospectively assigning to VDSI any inventions conceived, worked on or developed in the course

12  of his employment.  Invention disclosures that Barrett authored and sent to in-house counsel and

13  to VDSI's outside patent lawyer recite, for each Invention, that (i) Barrett conceived it in the

14  ordinary course of his employment, (ii) Barrett and his VDSI colleagues developed the Invention

15  (i.e., reduced it to practice) in the course of their work at VDSI from late 2004 through 2013, and

16  (iii) VDSI resources fueled each Invention's development.  Consequently, while Barrett may be

17  the "inventor" of each Invention, his Inventions Agreement with VDSI automatically assigned

18  each Invention to VDSI on its creation.

19  The VDSI business unit in Liberty Lake that Barrett led was unprofitable.  In 2013,

20  therefore, VDSI decided to shutter the unit.  VDSI unfortunately was compelled to lay off Barrett

21  and most of the other Liberty Lake employees.  Shortly afterward, Barrett claimed that he is the

22  owner of the Inventions and the corresponding patent rights, prompting Venture to commence

23  this action.  Barrett ultimately articulated his joint venture theory and counterclaimed.[3]

---

[3] Barrett's Amended Counterclaim alleges eight claims for relief:  breach of fiduciary duty arising from a
joint venture; repudiation of a joint venture; conversion; breach of contract; breach of the implied covenant of
good faith and fair dealing; unjust enrichment; constructive fraud; and actual fraud.  Each counterclaim
seeks as its remedy one-half of profits that Plaintiffs purportedly made based on sales of products
embodying the Inventions.  (*See* Dkt. No. 38 at p. 54-55, ¶¶8.1-8.5 (describing the relief sought).)  While
Barrett purports to seek relief for "mental suffering and emotional distress" for his breach of contract
claim (Dkt. No. 38 at 55, ¶8.3) this remedy is unavailable for breach of a non-insurance contract.  *See* Cal.
Civ. Code § 3300; *see also Erlich v. Menezes*, 21 Cal. 4th 543, 553-554 (1999).

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

Each of Barrett's counterclaims is predicated on his purported ownership of some rights in the Inventions. As summarized above, however, Barrett's assignment of all such rights to VDSI – through the Inventions Agreement made before Barrett's employment commenced – precludes his claim to ownership. Because the Inventions and resulting patent and patent applications belonged to VDSI, Barrett had nothing to contribute to the purported joint venture with VCL apart from his efforts in developing the Inventions, which *VDSI* was employing him to do.

Barrett's counterclaims also fail because they rest on an alleged oral modification of the Inventions Agreement with a third party to the contract. Barrett and VDSI agreed in the Inventions Agreement that any modifications to it must be in a writing signed by both parties. Barrett contends that an oral agreement *with VCL* modified the Inventions Agreement *with VDSI*, conferring on him half of the profits generated by commercial embodiments of the Inventions and requiring VCL to later pay for any patents or patent applications corresponding to the Inventions. Because VDSI – the other party to the Inventions Agreement – never agreed to such a modification, and because the purported modification is not in writing, let alone a writing signed by Barrett and VDSI, Barrett's "joint venture" theory fails, and his counterclaims fail with it.

Finally, Barrett cannot adduce evidence that he has been damaged. As shown below, the MineTracer product embodies the issued patent, while the Refuge Life Support system ("RLS") embodies the two published patent applications. The MineTracer product was approved for use in mines in 2007 and has been sold commercially since that time. Unfortunately, it has yet to come close to making back the investment of over $15 million in development costs. It has generated no profit. Unlike MineTracer, RLS has still not received regulatory approval for use in mines. Thus, other than *de minimis* prototype sales, Venture has not yet sold RLS commercially and has therefore not been able to make a dent in the over $4 million it invested in developing the system. With no profits generated, no profits exist to be shared even assuming arguendo that Barrett's joint venture allegations were true.

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

III.    **STATEMENT OF UNDISPUTED FACTS**

    A.    **BARRETT ACCEPTS EMPLOYMENT WITH VDSI PURSUANT TO THE TERMS OF THE INVENTIONS AGREEMENT**

In June 2003, Barrett was employed by Agilent Technologies, Inc. when he was informed that his employment with Agilent would end on October 31, 2003 and that he would then become a VDSI employee. (Declaration of Joseph Grasser in Support of Motion for Summary Judgment ("Grasser Decl.") Exhibit A at ¶ 8.)  On June 28, 2003, Barrett signed the Inventions Agreement and became a VDSI employee on November 1, 2003.  (Grasser Decl., Ex. B; Ex. C at 29:13-15, 114:19 - 115:13; 123:7-17.)

    B.    **THE INVENTIONS AGREEMENT PROVIDES, *INTER ALIA*, THAT ANY CONCEPT ON WHICH BARRETT WORKS DURING HIS EMPLOYMENT IS ASSIGNED TO VDSI**

The Inventions Agreement contains several key provisions relating to the disclosure of any inventions and the assignment of Barrett's rights to any such invention to VDSI.  With regard to disclosure, Section 3.1 provides as follows:

> [Barrett] will disclose promptly to the proper officers or attorneys of the Company in writing any idea, invention, work of authorship (including, but not limited to, computer programs, software and documentation), formula, device, improvement, method, process or discovery, whether or not patentable or copyrightable (any of the foregoing items hereinafter referred to as an "Invention"), [he] may conceive, make, develop or work on, in whole or in part, solely or jointly with others during the term of [his] employment with the Company. The disclosure required by this Section applies: (a) during the term of my employment and for six months thereafter; (b) during my regular hours of employment and to my time away from work; (c) whether or not the Invention was made at the suggestion of the Company; (d) whether or not the Invention was reduced to drawings, written description, documentation, models or other tangible form; and (e) to any Invention which, in the opinion of the Company, is related to the company because it is related:
>
> > i.    to the general line of business engaged in by the Company;
> >
> > ii.    to any actual or anticipated business (including research and development) of the Company; or
> >
> > iii.    to suggestions made by the Company or which resulted from any work assigned by or performed for the Company.

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

-4-

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

(Grasser Decl., Ex. B at BAR5-6.)  Section 3.2, which covers the assignment of rights to which Barrett agreed, provides as follows:

> [Barrett] hereby assign[s] to the Company without royalty or any other further consideration my inner right, title and interest in and to any Invention [Barrett is] required to disclose under Section 3.1; provided, that [Barrett] acknowledge[s] and agree[s] that the Company has hereby notified me that the assignment provided for in this Section 3.2 does not apply to any Invention which qualifies fully for exemption from assignment under the provisions of Section 2870 of the California Labor Code, a copy of which is attached hereto as Exhibit 3.2.

(Grasser Decl., Ex. B at BAR6.)[4]  The exception outlined by Section 2870 provides, in pertinent part, as follows (emphasis added):

> (a)      Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:
>
> (1)      Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or
>
> (2)      Result from any work performed by the employee for the employer.[5]

Taking the terms of the Invention Agreement and Section 2870 together, if Barrett "conceive[s,]" "develop[s]" or even just "work[s] on" any "Invention" during his employment at VDSI, he assigned that Invention to VDSI, unless he (1) does not use **any** of VDSI's equipment,

---

[4] The Inventions Agreement also provides that it "shall be construed and governed by the laws of the State of California applicable to contracts entered into and wholly to be performed in California by California residents."  (Grasser Decl., Ex. B at § 5.1.)  In any event, Washington state has a nearly identical statue that, for purposes of this suit, would not result in any different outcome.  *See* RCW § 49.44.140.  Further, the Inventions Agreement could only be modified in a "writing signed by the party against whom enforcement of such modification is sought."  (*Id.* at § 5.7.)

[5] In other words, three separate scenarios exist under which an invention assignment agreement remains enforceable under section 2870:  "(1) The invention was developed using the employer's time or resources; or (2) The invention relates to the employer's business or actual or demonstrably anticipated research or development; or (3) The invention resulted from work performed by the employee for the employer."  *Cadence Design Sys., Inc. v. Bhandari*, Case No. C 07-00823 MHP, 2007 U.S. Dist. LEXIS 83078 at *18-19 (N.D. Cal. Nov. 8, 2007)

1   supplies, facilities, resources or trade secrets, **and** (2) the Invention does not relate to VDSI's

2   actual or reasonably anticipated business, **and** (3) the Invention does not result from any work

3   performed by Barrett for VDSI.

4       Critically, if there was any invention that Barrett conceived of prior to his work date that

5   he wished to be excluded from the Invention Agreement, he was obligated to "attach to Schedule

6   3.5B of this [Inventions] Agreement a brief description of all Inventions made or conceived by

7   me prior to my employment with the Company which [Barrett] desire[s] to be excluded from this

8   Agreement." (Grasser Decl., Ex. B at BAR6-7.)  Despite his stance in this litigation that he

9   thought his Inventions were excluded from the agreement, Barrett did not identify **any** inventions

10  in Schedule 3.5B and **never** attempted to update this contract.  (*Id*. at BAR11; Ex. C at 118:4-

11  129:4.)  The only reason Barrett could offer as to why he failed to update the agreement was that

12  it "never crossed [his] mind." (Grasser Decl., Ex. C at 128:17-129:4.)

13      C.   **WHILE EMPLOYED BY VDSI, BARRETT WORKED ON THE INVENTIONS WITH HIS**
           **VDSI CO-WORKER AND THEN HE DISCLOSED THE SAME "PER" THE**
14         **INVENTIONS AGREEMENT**

15      By early 2005, in the words of Barrett, "VDSI was floundering, and [Barrett] felt like [he]

16  might be out of a job." (Grasser Decl., Ex. A at 8:25.)  Barrett's immediate supervisor, Bob

17  Armantrout, informed him that the project on which he was previously working was cancelled

18  and that "there was an immediate directive . . . to go out and try to sell [VDSI] as contract design

19  services to other companies." (Grasser Decl., Ex. C at 54:18-57:15.)  Working under this

20  directive, Barrett was able to procure a single, small contract that did little more than "keep the

21  lights on." (*Id*.)  In the first few months of 2005, Barrett also spoke with a co-worker of his,

22  Yuewen Xi, about potential possibilities for further work. (*Id*. at 58:14-59:13.)  Eventually, these

23  discussions led to the revelation the Ms. Xi's brother was a high-level government official for

24  China's mine safety agency. (*Id*. at 61:4-10.)  At this point, Barrett claims to have realized that

25  an invention he had conceived of may have an impact in China. (Grasser Decl., Ex. A at 8:25-

26  9:6.)

27      After this initial work with Ms. Xi, Barrett then "disclosed the inventions to VDSI in

28  March 2005 per [the Inventions A]greement when [he] intended to resume working on those

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

inventions." (Grasser Decl., Ex. A at 5:25-27; Ex. C at 112:24-113:20.)  Barrett contends that in this disclosure, he explained to his boss at VDSI and others at VCL how this "concept" would be a great fit for VDSI.  (*Id*.)  Among other things, Barrett explained that the technology was so related to VDSI's ongoing work that it could "be quickly married with VDSI's back-end remote monitoring competencies to create revolutionary solutions" and would be marketable, for example, in China because of the connections that his co-worker Yuewen had in the Chinese government.  (Grasser Decl., Ex. D at Barrett 1852.)  Barrett further noted that "[t]he technologies are consistent with the directions we probably want to go within your organization." (*Id*.)  In sum, Barrett then proposed that "VDSI initiate development of a solution for coal mine safety." (*Id*.)  Moreover, Barrett even noted that "[i]t is entirely possible that some or all of this solution ***would be patentable by Venture***." (*Id*. (emphasis added).)

Both before and after this disclosure, Barrett continued to explore the possibilities for commercializing his invention in China utilizing the connections and language skills of his colleague and fellow VDSI employee, Ms. Xi.  (*See*, *e.g.*, Grasser Decl., Ex. C at 77:24-79:9.)  It was only later in May 2005 that Barrett claims an oral joint venture was formed between VCL and himself.  (*See* Grasser Decl., Ex. A at ¶¶ 23-30.)  To be clear, under Barrett's version of events, he claims that he both worked on exploring a commercial market for the Inventions in China and disclosed the Inventions "per" the Inventions Agreement ***before*** he claims to have entered into a joint venture.

According to Barrett, all of the communications of the terms of this alleged joint venture were by telephone and not in writing.  (*Id*.)  Moreover, despite this radically different relationship, Barrett "would continue to be paid the same as a VDSI employee . . . because [he] was doing the same kind of commercial development work for a 'customer's' product as VDSI did with Agilent's project . . . ." (*Id*. at 14:1-7.)  However, Barrett's self-serving, post litigation interrogatory responses and deposition testimony comprise the ***only*** purported "evidence" regarding this joint venture.[6]

---

[6] In fact, when questioned at deposition Barrett was unable to identify any language that would indicate that he was proposing a radically different business relationship with either VDSI or VCL when he

Then from 2005 until Barrett's termination in 2013, he and his co-workers at VDSI worked on developing commercial applications for the products. (*See*, *e.g.*, Grasser Decl., Ex. C at 143:10-20. Furthermore, there were "development activities, meaning design, garden variety R&D, that took place" with regard to the MineTracer invention after 2003. (Grasser Decl., Ex. C at 157:2-158:21 (explaining some of the commercialization work done by VDSI).) Indeed, as detailed in Sections D and E, *infra*, between 2005 and 2013, VDSI employees, with considerable monetary investment from Venture, attempted to commercialize the inventions without success. This commercialization process ultimately led to two separate product lines: the MineTracer product and RLS. (Lee Decl.), ¶¶ 3-6.)

**D.   BARRETT CONTEMPORANEOUSLY ADMITS IN WRITING THAT HE CONCEIVED OF AND WORKED ON THE INVENTIONS DURING HIS EMPLOYMENT WITH VDSI**

As Barrett and others at VDSI developed what would eventually become the Inventions, he worked with Venture's patent lawyer to obtain patent protection. Barrett accordingly prepared a written "Invention Disclosure" for each invention. Barrett testified that he drafted the entirety of each of the Invention Disclosures. (Grasser Decl., Ex. C at 154:16-155:8; 203:6-20.) He has further stated on the record that the Invention Disclosure is a true and accurate statement of the facts. (*Id*. at 154:10-155:8; 203:17-20; and 206:20-207:12.) Each disclosure confirms that the Inventions were created, tested and/or worked on at VDSI, through the use of VDSI equipment and supplies, with the help of VDSI employees, and that all of this occurred during the term of Barrett's employment at VDSI.

These documents, authored by Barrett, confirm that he conceived of, worked on and developed the MineTracer invention **after** he became a VDSI employee on November 1, 2003. Barrett provided two copies of the Invention disclosure for MineTracer to, among other people, Lee Ghai Keen and Venture's in-house counsel as an attachment to an April 29, 2009 email. (Lee Decl., Ex. A at VENTURE036270, VENTURE036420-37 and VENTURE036438-56.) Both

disclosed the MineTracer invention "per" the Inventions Agreement. (*See* Grasser Decl. Ex. C at 71:25-75:25 and 86:6-19.) Barrett himself testified that he did not disclose the existence of this alleged joint venture anyone at VDSI or VCL. (*Id*. at 170:10-20.)

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

versions of the MineTracer disclosure confirm that the date of its "first written description" was in October 2004 -- well after Barrett began his work pursuant to the Inventions Agreement in November 2003.  (Lee Decl., Ex A at VENTURE036424 & VENTURE036442.)  Furthermore, they confirm that, consistent with Barrett's deposition testimony, the "first oral disclosure" was made in March 2005 to fellow VDSI employees Yuewen Xi and Chris Lutz.  (Lee Decl., Ex A at VENTURE036424 & VENTURE036442.)  Furthermore, the Barrett-authored documents confirm that the "construction of the invention" was made by "Venture Design Services R&D Team" and that testing of the device began in June 2005 and continued through May 2007.  (Lee Decl., Ex A at VENTURE036424 & VENTURE036442-V43.)   These disclosures further confirm that a number of VDSI employees were "associated with the making of the invention."  (Lee Decl., Ex. A at VENTURE036434 & VENTURE036452-53.)   In fact, in response to the question "Who sponsored or paid for the work that led to the invention or part thereof," Barrett stated that the project was sponsored by both VDSI and VCL.  (Lee Decl., Ex. A at VENTURE036434 & VENTURE036453.)

The Invention Disclosure for the Gas Monitoring Invention also confirms that it comes within the ambit of the Inventions Agreement.  For example, it confirms that the date of the first drawing and written description was January 24, 2011 and that it was first orally disclosed in October 2010.  (Grasser Decl., Ex. E at BAR150; *see also* Grasser Decl., Ex. C at 202:3 - 204:14.)  Further, it confirms that the construction of the invention first occurred on January 24, 2011 and was completed by "James Barrett and Marty Goss (Marty Goss is [a] Venture Design Services contract electrical engineer)."  (Grasser Decl., Ex. E at BAR150.)  Likewise it was tested between October 2010 and December 2011.  (*Id*.)  As he did in the MineTracer disclosure, Barrett also acknowledges that a number of other VDSI employees were "associated with the making of the invention."  (Grasser Decl., Ex. E at BAR159.)  And, as with MineTracer, Barrett confirmed that "**Venture Design Services, Incorporated**" sponsored or paid for the work that led to the invention.  (*Id*. (original emphasis).)

Finally, consistent with the invention disclosure documents for the MineTracer and Gas Monitor Inventions, the Gas Scrubber's invention also confirms that it too comes within the

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

assignment provision of the Inventions Agreement. The Gas Monitor disclosure confirms that the date of the first drawing and written description was January 24, 2011 and that it was first orally disclosed in October 2010. (Grasser Decl., Ex. F at BAR72; *see also* Ex. C at 204:20 - 205:10 and 206:20-207:12.) Construction of the Gas Scrubber was first completed on January 24, 2011 and was completed by "James Barrett and Mike Surdock and Marty Goss (Marty is [a] Venture Design Services contract electrical engineer)." (Grasser Decl., Ex. F at BAR72.) Testing of the Gas Scrubber took place from October 2010 through April 2011. (*Id.*) Barrett similarly acknowledges that a number of other VDSI employees were "associated with the making of the invention." (Grasser Decl., Ex. F at BAR82-83.) And, as with the other two inventions at issue, in response to the question "Who sponsored or paid for the work that led to the invention or part thereof," Barrett states, "**Venture Design Services, Incorporated**." (Grasser Decl., Ex. F at BAR83 (original emphasis).)

In sum, Barrett prepared all these invention disclosures and he has testified to their accuracy, thereby adopting each as his own testimony. The admissions contained in these disclosures confirm that each of the inventions was conceived of and worked on by Barrett (and other VDSI employees) during the term of Mr. Barrett's employment with VDSI. Consistent with these contemporaneous admissions that the Inventions were conceived of and worked on during the term of Barrett's employment with VDSI, Barrett entered into contracts memorializing and confirming the assignment of rights pursuant to the Inventions Agreement.[7] (*See* Dkt. No. 38 at ¶7.4; Exs. 1-4.)

**E.     NEITHER PRODUCT OF THE PURPORTED JOINT VENTURE HAS BEEN PROFITABLE.**

As mentioned above, the Inventions eventually became embodied in two distinct products: the MineTracer product and RLS. (Lee Decl., ¶¶ 3-6.) As laid out in detail below, neither product has generated profit nor is there any evidence that either product will ever be profitable.

---

[7] Notably, in these assignments, Barrett "acknowledged" that he had already received consideration for these assignments, his employment with VDSI. (Dkt. No. 38, Ex. 1 at p. 57, Ex. 2 at 60, and Ex. 3 p. 63.)

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

Barrett testified that he initially had no "specific agreement as to the calculation" of the "profits" to which he alleges he was entitled. (Grasser Decl., Ex. C at 144:1-11.)  Nevertheless, he later understood that the profits would only be recognized "when the investment cost is paid off to zero."  (*Id*. at 145:9-146:3 (confirming that Barrett "assented" to this definition).)  As laid out more fully below, Venture has invested over $15 million in MineTracer and over $4 million in RLS and has not come close to recouping those investments.

Sales of the MineTracer product began in 2007, but it has not generated sufficient profit to pay off the substantial investment in the developing the product.  (Grasser Decl., Ex. G at 101:13-102:3 ("Basically it's an unprofitable business."); Ex. H at 64:3-15 and at 190:8-11; *see also* Lee Decl., Ex. B at 1-6 (showing the sales, gross margin, and investment costs for the MineTracer and RLS by year and in total).)  As shown in Exhibit B to the Lee Declaration, Venture invested $15,492,000 since 2005, but has only generated $5,228,000 in gross margin. (Lee Decl., Ex. B at 5.)  Consequently, MineTracer would need to generate over $10,000,000 in additional gross margin in order to pay off the investment costs before any "profit" could be realized.  (*Id*.) In other words, Venture would need to triple its sales of MineTracer in order to cover its investments costs before any profit would be generated – and there is no evidence of any opportunities for increased sales of MineTracer.

RLS has similarly failed to generate any profit.  Before RLS may be sold to any mine operators it must be approved by the Mine Safety and Health Administration ("MSHA") here in the United States, and it must also receive a similar approval in other countries, such as China, before it can be sold there. (Lee Decl. at ¶10.)  RLS never received that approval. (Grasser Decl., Ex. G at 26:14-22; 99:22-100:1.)  Consequently, it cannot be installed in mines in the U.S.[8] (Grasser Decl., Ex. G at 39:6-10; 85:7-11.)  As a result, it has never been sold commercially

---

[8] Furthermore, it is a guessing game as to when, if ever, final regulatory approval will come.  (Grasser Decl., Ex. I at 198:6-12 ("we've had so many problems and delays with MSHA that it's impossible to accurately determine exactly what is going on behind the closed door at MSHA and how long it will take them at...any given point to conclude their evaluation.")  In addition, Barrett has proffered no expert opinion on this issue.

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

1  (other than *de minimis* sales of prototypes).   (Grasser Decl., Ex. G at 99:22-100:1; Ex. H at

2  177:22-178:9.)

3     Against the lack of any meaningful sales, though, Venture has nonetheless invested

4  $4,036,000 in development costs for RLS.  (Lee Decl., Ex. B at 2.)  Given the inability to sell this

5  product commercially, it is not surprising that it has only generated $174,000 in gross margin.

6  (*Id.*)   As such, sales of the Refuge Life System would need to generate nearly $4,000,000 in

7  additional gross margin (*i.e.*, a 22-fold increase in sales to date) before any profit would be

8  generated and there is no evidence of any opportunity for sales of the product in the future.[9]

9  **IV.   DISCUSSION**

10     **A.   SUMMARY JUDGMENT STANDARD**

11     Summary judgment is proper here because the pleadings and all of the documents and

12  testimony elicited thus far demonstrate that "there is no genuine dispute as to any material fact

13  and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp.*

14  *v. Catrett*, 477 U.S. 317, 322 (1986).  There remain no questions to be answered to determine the

15  rights of the parties under the applicable substantive law.  *See Matsushita Elec. Indus. Co., Ltd. v.*

16  *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  A dispute is only genuine "if the evidence is such

17  that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty*

18  *Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court must review the record as a whole and draw all

19  reasonable inferences in favor of the non-moving party. *Hernandez v. Spacelabs Med. Inc.*, 343

20  F.3d 1107, 1112 (9th Cir. 2003).   But unsupported conjecture or conclusory statements are

21  insufficient to defeat summary judgment. *Id.*; *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097,

22  1103 (9th Cir. 2008).  Indeed, to avoid summary judgment, the opposing party cannot rest solely

23

24  [9] Indeed, even Barrett's own "expert" has recognized that no profit has been generated by any of the
   products at issue.  In his "expert report," Barrett's expert, Scott Hampton, purports to quantify the amount
25  of "revenue and profit" that the products at issue would have generated had certain sales prospects been
   successful. (Grasser Decl., Ex. J at ¶1.)  While the Hampton report is wholly speculative and inadmissible
26  for the reasons set forth in the concurrently-filed motion to exclude, it nonetheless confirms that no profits
   have been generated.  Specifically, at the conclusion of his report, Mr. Hampton combines his hypothetical
27  sales with the "actual sales of and profits of the" products at issue, he is forced to lower his dollar figures
   to account for Venture's losses.  (*Id.* at ¶31.)
28

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

1  on conclusory allegations of fact or law.  *See Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir.

2  1986).  Instead, the non-movant must designate which specific facts show that there is a genuine

3  issue for trial.

4         The party moving for summary judgment bears the initial burden of identifying those

5  portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine

6  issue of material fact.  *Celotex*, 477 U.S. at 323-24.  Where the moving party has the burden of

7  proof at trial, he must "affirmatively demonstrate that no reasonable trier of fact could find other

8  than for the moving party."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir.

9  2007).  Once the moving party meets this initial burden, the non-moving party must go beyond

10 the pleadings and by its own evidence set forth specific facts showing that there is a genuine issue

11 for trial.  *See* Fed. R. Civ. P. 56(e).  The non-moving party must "identify with reasonable

12 particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275,

13 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co*., 55 F.3d 247, 251 (7th Cir. 1995))

14 (stating that it is not a district court's task to "scour the record in search of a genuine issue of

15 triable fact").  If the non-moving party fails to make this showing, the moving party is entitled to

16 judgment as a matter of law.  *Celotex*, 477 U.S. at 323.

17        **B.    CALIFORNIA, NOT WASHINGTON, LAW GOVERNS THIS MOTION**

18        Aside from the continuous stream of citations to California law in Barrett's counterclaim,

19 it is clear that California law applies to each of the causes of action in this case, because,

20 fundamentally, each cause of action is connected to the Inventions Agreement that Barrett

21 signed.  *See, e.g.,* Second Amended Answer and Counterclaim Complaint at ¶¶ 2.1.5, 2.2.1, 2.3.2,

22 7.2.12, 8.2, 8.4.  Controlling Ninth Circuit precedent holds that this Court, sitting in California,

23 should enforce choice of law clauses and, when doing so, should look to the law of the forum

24 state, California, in applying choice of law principles.  *See, e.g., Hatfield v. Halifax PLC*, 564

25 F.3d 1177, 1182 (9th Cir. 2009).  Under California law, a choice of law clause will be enforced if

26 *either* there is a substantial relationship between California and the parties or if any other

27 reasonable basis for the choice of California law exists.  *See, e.g., id.* (enforcing a choice of law

28 clause on behalf of a third party beneficiary as to all claims) (*see also* citations therein).  Here the

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

choice of law clause reinforces this Court's ordinary obligation to apply the law of the forum state in a diversity case. *See id.*

Here both parties have signed the Inventions Agreement which contains the choice of law provision. Thus, a reasonable basis for the enforcement of California law exists: If one of the parties is incorporated in the chosen state, this is sufficient to meet the substantial relationship test. *Id.* at 1183. VDSI is incorporated in California. (*See* Grasser Decl., Ex. H at 21:20-21.). Further, there is no indication that the choice of California law is otherwise unreasonable here. *See, e.g., Gravquick A/S v. Trimble Navigation Int'l*, 323 F.3d 1219, 1224 (9th Cir. 2003) (finding the application of California law to a contract involving a California corporation but performed partially in California and partially elsewhere was not unreasonable); *Mail Boxes Etc., USA, Inc. v. Considine*, 2000 U.S. App. LEXIS 16185 at *4-5 (9th Cir. 2000) (applying Washington and California law, which both support enforcing choice of law provisions, to enforce ambiguous controlling law provision and determining that California law applied pursuant to either set of choice of law rules). Moreover, here, all of the claims arise out of ownership of the Inventions, which is directly tied to the Inventions Agreement, which is expressly governed by California law. (Grasser Decl., Ex. B at BAR7.) Barrett's tort, business, and contract claims all arise out of or relate to the employment relationship defined in the Inventions Agreement. Accordingly, the choice of law provision contained therein governs all of the parties' claims. *See Hatfield*, 564 F.3d at 1183 ("a valid choice-of-law clause . . . encompasses all causes of action . . . regardless of how they are characterized . . . emanating from the . . . legal relationship.").

**C.** **BARRETT CANNOT OWN ANY OF THE PENDING PATENTS AND PATENT AT ISSUE BECAUSE HE CREATED THESE INVENTIONS AS AN EMPLOYEE OF VDSI**

Pursuant to the terms of Barrett's Inventions Agreement, Barrett was obligated to disclose, among other things, any invention or idea he "worked on" during the course of his employment. The Inventions Agreement prospectively assigned to VDSI any invention for which disclosure was required. Barrett admits that he disclosed the Inventions to VDSI "per [the Inventions A]greement." (Grasser Decl., Ex. A at 5:25-27 (emphasis added).) Moreover, when he disclosed

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

1   each Invention, Barrett admitted that it related to VDSI's business and its reasonably anticipated

2   areas of research.  (Grasser Decl., Ex. D at Barrett 1852.)  These admissions are fatal to any claim

3   by Barrett and solidify Venture's position that Barrett assigned the Inventions to VDSI.  Because

4   VDSI was the assigned owner of the Inventions at all relevant times, Barrett's claims fail, and

5   VDSI must prevail as a matter of law.

 

6       **1.      BECAUSE BARRETT DISCLOSED THE INVENTIONS "PER" THE**

                     **AGREEMENT AND WORKED ON AND DEVELOPED THE INVENTIONS**

7                     **WHILE AN EMPLOYEE, THEY WERE ASSIGNED TO VDSI**

8        Pursuant to Section 3.2 of the Inventions Agreement, Barrett assigned to VDSI "any

9   Invention [he is] required to disclose under Section 3.1."  (Grasser Decl., Ex. B at BAR6.).

10  Barrett acknowledges that his "agreement with VDSI required disclosure of inventions, etc., that

11  [he] might conceive, make, develop, or work on during the term of my employment with

12  Venture."  (Exhibit A at 8:16-20.)

13       Barrett contends that the Inventions do not fall within this clause.  Rather, he contends

14  that the Inventions fall within the ambit of Labor Code section 2870 and are thus excluded from

15  assignment.  The undisputed facts prove otherwise.  First, Barrett admitted that he "disclosed the

16  inventions to VDSI in March 2005 *per* [the Inventions A]greement when [he] intended to resume

17  working on those inventions."  (Grasser Decl., Ex. A at 5:25-27 (emphasis added).)  Because he

18  disclosed the Inventions pursuant to Inventions Agreement Section 3.1, Section 3.2 *assigned*

19  *them* to VDSI.  (*See* Grasser Decl., Ex. B at §3.2 ("I hereby assign to [VDSI] without royalty or

20  any other further consideration my entire right, title and interest to any Invention I am required to

21  disclose under Section 3.1.")   This admission, that he disclosed the Inventions "per" the

22  Inventions Agreement is thus fatal to Barrett's claims of ownership.

23       Separately, Barrett also assigned the Invention to VDSI pursuant to the Inventions

24  agreement because the uncontested facts show that, from at least early 2005 until his termination,

25  Barrett and others at VDSI "worked on" the Inventions, including efforts to complete the

26  inventions, build prototypes and commercialize the products.  (*See* Sections III.C-III.E, *supra*.)

27  Indeed, Barrett's purported impetus to work on the project came about because of his work with

28  another VDSI employee.  (Grasser Decl., Ex. C at 58:14-59:13 and 61:4-10.)  He further worked

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

on developing the technology and evaluating potential markets for his conception with that employee in the first few months of 2005.  *See*, *e.g.*, Grasser Decl., Ex. C at 77:24-79:9.)  It was only ***after*** this work on the Inventions, and ***after*** Barrett disclosed the invention to his supervisor, that he claims the alleged oral "joint venture" was formed.  (*See* Grasser Decl., Ex. A at ¶¶ 23-30.)  However, as a result of Barrett's work on and disclosure of the Inventions, the Inventions had already been assigned to VDSI by operation of the Inventions Agreement before the alleged "joint venture" was formed.

### 2.   THE INVENTIONS DO NOT COME WITHIN THE EXCEPTION CREATED BY LABOR CODE SECTION 2870

The only exception to the assignment provision in Section 3.2 is the exception contained within California Labor Code Section 2870.  That section, however, does not apply to the Inventions for two reasons:  (1) the Inventions were developed using VDSI's time and resources and (2) the Inventions are related to VDSI's business and anticipated research and development.

### a.   Barrett and Other VDSI Employees Used VDSI's Resources to Develop the Inventions

The incontestable facts reflect that VDSI's time, VDSI's money and resources, and the time and expertise of other VDSI employees were devoted to developing the Inventions.  (*See* Sections III.C through III. E, *supra*.)  Section 2870 provides that "if the invention was developed using the employer's time or resources, then the statute [Section 2870] does not prohibit assignment."  *Cadence Design Sys., Inc.*, 2007 U.S. Dist. LEXIS 83078 at *17-19 n. 4 (N.D. Cal. Nov. 8, 2007); *see also Iconix, Inc. v. Tokuda*, 457 F. Supp. 2d 969, 991-992 (N.D. Cal. 2006) (noting that "even if it was considered acceptable for Shen to use his Iconix computer for personal use, any Inventions developed using that computer had to be assigned and transferred.")

Here, at a minimum, it is undisputable that Barrett utilized VDSI employee Yuewen Xi's language expertise and personal connections in China to work on developing the product.  (Grasser Decl., Ex. C at 61:4-10, 77:24-79:9; Ex. A at 8:25-9:6.)  Furthermore, using his company email, he disclosed the Invention.  (Grasser Decl., Ex. C at 87:22-88:1; *see also* Ex. D.)  Accordingly, Barrett's use of VDSI's resources and employees combined with the fact that he

1    worked on developing the inventions while a VDSI employee renders the limited exception of

2    Section 2870 inapplicable to the Inventions.  *See Iconix*, 457 F. Supp. 2d at 991-992.

3           **b.    The Inventions Relate to VDSI's Business and Its Anticipated
                    Areas of Research**

4

5           As Barrett himself acknowledged, the technology at the heart of the Inventions related

6    directly to VDSI's then-existing business.  Indeed, part of the reason Barrett saw an opportunity

7    for Venture was because the Inventions were so related to Venture's core expertise that they

8    could "be quickly married with VDSI's back-end remote monitoring competencies to create

9    revolutionary solutions."  (Grasser Decl., Ex. D at Barrett 1852; *see also* Grasser Decl., Ex. C at

10   69:9-25.)  Moreover, Barrett, at the time, contended that "[t]he technologies are consistent with

11   the directions we probably want to go within your organization."  (*Id*.)  Barrett then proposed that

12   "***VDSI*** initiate development of a solution for coal mine safety."  (*Id*. (emphasis added).)

13   Moreover, Barrett even noted that "[i]t is entirely possible that some or all of this solution ***would***

14   ***be patentable by Venture***."  (*Id*. (emphasis added).)  In other words, from the first time he

15   disclosed the Inventions to his supervisors, Barrett recognized that the Inventions were related to

16   VDSI's business and any intellectual property resulting from developing the invention would be

17   owned by Venture.

18          That the particular application (to mining safety technology) of VDSI's wireless

19   networking and electronic communications expertise was not then part of Venture's catalog of

20   products is not critical.  Indeed, "[c]ourts interpreting employee assignment agreements in the

21   context of section 2870 have construed the 'related to' phrase broadly."  *Cadence Design Sys.*,

22   2007 U.S. Dist. LEXIS 83078 at *19 (citing *Cubic Corp v. Marty*, 185 Cal. App. 3d 438 (1986)).

23   The *Cubic* case is particularly instructive.  The employee there, much like Barrett here, assigned

24   to his employer any invention "coming within the scope of Company's business or related to

25   Company's products or to any research, design, experimental or production work carried on by

26   Company."  185 Cal. App. 3d at 444.  Cubic was in the business of flight training software and

27   the employee created an electronic combat simulator.  *Id*. at 444-45.  Notwithstanding that "Cubic

28

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

did not produce a product with electronic warfare training capacities, that in particular the ACMR did not have electronic warfare training capacities and that Marty's invention did not necessarily have to be embodied in the ACMR system," the Court found that the product was "related to" Cubic's business under Section 2870. *Id*. at 447. Of particular importance here, the Cubic court found it persuasive that the defendant employee (*a la* Barrett) "presented the invention to Cubic as something to enhance Cubic's" products." *Id*. Because the Inventions were "related to" VDSI's business, Section 2870 does not apply.

### 3.   BARRETT'S ALLEGED "JOINT VENTURE" IS AN IMPERMISSIBLE MODIFICATION OF THE INVENTIONS AGREEMENT

Despite the plain language of his Inventions Agreement automatically assigning the Inventions to VDSI, Barrett contends that he entered into an oral joint venture with VCL, pursuant to which he would "deliver" the Inventions to VCL and, in return, VCL would fund the development processes. (Grasser Decl., Ex. A at 13:12-14:16.) Notwithstanding the dearth of evidence that supports the existence of any such agreement, the alleged oral agreement does not impact that Inventions Agreement, which (as discussed above) served to transfer the rights in the inventions to VDSI.

The Inventions Agreement explicitly forbids any modification that is not in writing. Specifically, Section 5.7 of the Inventions Agreement provides that the terms could only be modified in a "writing signed by the party against whom enforcement of such modification is sought." (Grasser Decl., Ex. B at BAR8.) California law, which governs the contract, provides that a "contract in writing may be subsequently modified by an oral agreement only if (i) the written contract does not contain an express provision requiring that modification be in writing . . . ." *Marani v. Jackson*, 183 Cal. App. 3d 695, 704 (1986). Accordingly, for the "joint venture" to have been effective, Barrett and VDSI would have needed to enter into a new written agreement allowing Barrett to retain ownership of the Inventions that were otherwise assigned to VDSI. Because no written modification of the Inventions Agreement exists, the purported oral joint venture agreement did not and could not alter the terms of the Inventions Agreement. Accordingly, Barrett's "joint venture" claims fail as a matter of law.

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

### 4.     BECAUSE VENTURE ALWAYS OWNED THE INVENTIONS, BARRETT'S CLAIMS FAIL

As the above analysis reveals, Barrett assigned the Inventions to VDSI through the Inventions Agreement.  Accordingly, Barrett did not have any property rights in the Inventions that VCL could have converted or out of which he could have been defrauded.  Likewise, without the Inventions to contribute to the joint venture (even if it was not an impermissible oral modification of the Inventions Agreement), Barrett's alleged joint venture (and breach of fiduciary duty claim based thereon) fails.  Finally, because his employment was consideration for the contract that Venture has allegedly breach by failing to pay consideration, Barrett's breach of contract claim also fails.[10]

### D.     BARRETT'S CLAIMS FAIL BECAUSE HE CANNOT PROVE DAMAGES

In order to succeed on his counterclaims, Barrett needs to be able to prove damages.[11] *See, e.g., Planet Goalie, Inc. v. Monkeysports, Inc*., CASE NO. CV 11-07263 RZ, 2013 U.S. Dist. LEXIS 57499 at *12-13 (C.D. Cal. Apr. 22, 2013) (granting summary judgment where "Plaintiff [] failed to provide in discovery any probative, competent evidence about lost profits, lost sales or

---

[10] Whether for lack of prior ownership of the goods in question or of harm suffered or of consideration for a deal, every cause of action alleged by Barrett fails when he never owned the Inventions in the first place. *See Martinez v. Welk Group, Inc*., 907 F. Supp. 2d 1123, 1132 (S.D. Cal. 2012) ("under the Ninth Circuit, 'a breach of contract claim requires a showing of appreciable and actual damage.'"); *Graham-Sult v. Clainos*, 756 F.3d 724, 737 (9th Cir. 2014) (elements of conversion include "plaintiffs' ownership or right to possession of the property"); *Clear Channel Outdoor, Inc. v. Bently Holdings Cal. LP*, No. C-11-2573 EMC, 2011 U.S. Dist. LEXIS 140764 at *26 (N.D. Cal. Dec. 7, 2011) ("The elements of unjust enrichment are 'receipt of a benefit and unjust retention of the benefit at the expense of another.'"); *Vacchiano v. Wessell*, Case No. CV 12-2003 DSF (VBKx), 2014 U.S. Dist. LEXIS 39554 at *9 (C.D. Cal. Mar. 24, 2014) (and citations therein showing damages to be required for all manner of fraud claims); *Brewer v. Indymac Bank*, 609 F. Supp. 2d 1104, 1119 (E.D. Cal. 2009) ("The elements of a cause of action for breach of fiduciary duty are: 1) the existence of a fiduciary duty; 2) a breach of the fiduciary duty; and 3) resulting damage.").

[11] For these reasons, Barrett will also be unable to establish his claim for emotional distress and mental suffering as a result of the alleged breach of contract.  *See Erlich v. Menezes*, 21 Cal. 4th 543, 553-554 (Cal. 1999) ("Generally, outside the insurance context, 'a tortious breach of contract . . . may be found when (1) the breach is accompanied by a traditional common law tort, such as fraud or conversion; (2) the means used to breach the contract are tortious, involving deceit or undue coercion or; (3) one party intentionally breaches the contract intending or knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages.'")

reputational losses."). This requirement applies equally to each of Barrett's claims.[12] Under any of Barrett's theories, the damages sought are net profits, and it is all he is seeking. (*See* Second Amended Answer and Counterclaims at ¶¶ 7.2.11, 7.2.13, 7.3.6, 7.4.2, 7.5.3, 7.6, 7.7.5, and 8.2; (Grasser Decl., Ex. C at 145:9-146:3, 148:9, 174:2-3.)[13] But there have been no profits and it does not appear that there will ever be any profits. (*See* Section III.E, *supra*.) Furthermore, both damage claims also fail as they are not supported by competent expert testimony – the speculative testimony of Barrett's expert should be struck. As a result, none of these claims can succeed.

Under California law, a claim for lost net profits fails when the claimant cannot demonstrate with reasonable certainty a monetary loss resulting from the other party's alleged bad acts. *Maggio, Inc. v. UFW*, 227 Cal. App. 3d 847, 870 (1991). Indeed, "it is fundamental that 'damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery.'" *Piscitelli v. Friedenberg*, 87 Cal. App. 4th 953, 989 (2001). As claims for lost profits typically arise from the context of failed business ventures, the case law typically analyzes them in such contexts. As laid out more fully below, two standards will apply to the business lines at issue here, one for established businesses and one for new businesses. Thus, it is appropriate to analyze the two different products – the MineTracer system (which has a track record of sales, albeit sales that failed to generate a profit) and RLS (which, even today, cannot be sold due to a lack of regulatory approval) – as if they were two different businesses.

---

[12] *See Martinez*, 907 F. Supp. 2d at 1132 ("under the Ninth Circuit, 'a breach of contract claim requires a showing of appreciable and actual damage.'") (and cases cited therein); *Graham-Sult*, 756 F.3d at 738 ("The elements of a cause of action for conversion [include] damages.'"); *Tyrone Pacific International, Inc. v. MV Eurychili*, 658 F.2d 664, 666 (9th Cir. 1981) (plaintiff's claim failed for inability to establish conversion damages which is based on the value of the converted property); *Clear Channel Outdoor, Inc.*, 2011 U.S. Dist. LEXIS 140764 at *26 ("The elements of unjust enrichment are 'receipt of a benefit and unjust retention of the benefit at the expense of another.'"); *Vacchiano*, 2014 U.S. Dist. LEXIS 39554 at *9 (and citations therein showing damages to be required for all manner of fraud claims); *Brewer*, 609 F. Supp. 2d at 1119 ("The elements of a cause of action for breach of fiduciary duty are: 1) the existence of a fiduciary duty; 2) a breach of the fiduciary duty; and 3) resulting damage.").

[13] Moreover, as discussed above, Barrett conceded that the "profits" to which he alleges he is entitled are only calculated after deducting all investments. (Grasser Decl., Ex. C at 145:9-146:3.)

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

Each standard will be applied in turn, and under either standard, Barrett cannot establish that damages are reasonably certain for either product under either standard.

### 1.   BARRETT'S CLAIM FOR DAMAGES FOR THE MINETRACER PRODUCT FAILS BECAUSE THAT PRODUCT NEVER GENERATED NET PROFITS.

To prove lost profits where an established business "is prevented or interrupted" requires a showing with "reasonable certainty" of what the "prospective profits that otherwise might have been" that is derived from "the past volume of business and other provable data relevant to the probable future sales." *Parlour Enterprises, Inc. v. Kirin Group, Inc*., 152 Cal. App. 4th 281, 287-288 (2007) (internal citations and quotations omitted); *accord Sargon Enterprises, Inc. v. University of Southern California*, 55 Cal. 4th 747, 781 (2012).   Barrett cannot succeed on a claim of damages for the profits purportedly produced by the MineTracer product, not even under the more lenient standard of the "established" business.   The lack of profits generated from the past volume of business is dispositive here as there is no data showing ***probable*** future sales sufficient to generate a profit.

The MineTracer product has been sold but has not generated any profit to date.  (Grasser Decl., Ex. G at 101:13-102:3 ("Basically it's an unprofitable business."); Grasser Decl., Ex. K at KT235; Grasser Decl., Ex. H at 64:3-15 and 190:8-11; *see also* Section III.E, *supra*.)  Thus, to the extent that there is a track record with this product, it is a track record of failure and of money spent but not recovered.  Indeed, it was so unprofitable that other related companies had to loan VDSI money to continue trying to carry and develop the product.  (Grasser Decl., Ex. H at 174:1-18.)  Nor is there any evidence whatsoever that VCL or VDSI had any reason not to put forward the best efforts to sell this product while Barrett was there.  Thus, there is neither a causal nexus for damages nor any economic harm to be had in regard to the MineTracer product.

Extrapolating future profits from that track record requires not only pure speculation, it requires an intentional disregard for the actual facts of the business.  Barrett has not and cannot present evidence to show that the product would succeed.  This lack of a track record of producing profits makes the likelihood of profits from the MineTracer business line even more speculative than profits from an unestablished business. *See Greenwich S.F., LLC v. Wong*, 190

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

1   Cal. App. 4th 739, 766 (2010) (finding the plaintiff's claim for lost profits to be too speculative

2   because the plaintiff assumed, rather than actually proved, the reasonable certainty of future

3   events upon which the damages claim depended); *Food Safety Net Services v. Eco Safe Systems*

4   *USA, Inc.*, 209 Cal. App. 4th 1118, 1132 (2012) (affirming grant of summary judgment on failure

5   to present evidence of damage because "lost profits based on a future contract cannot be

6   recovered when the contract is uncertain or speculative"); *Kids' Universe v. In2Labs*, 95 Cal.

7   App. 4th 870, 887 (2002) (Finding no triable issue as to lost profits where, among other things,

8   the lost profits were speculative because the toy store had never before operated its website "as a

9   profit-producing venture," and the online toy market "was not an established one."); *accord*

10   *Brother Records v. Jardine*, 318 F.3d 900, 910 (9th Cir. 2003) (affirming summary judgment

11   where, as a matter of law, prospective profits could not be shown with reasonable certainty ).

12   **2.   BARRETT'S CLAIM FOR DAMAGES FOR RLS FAILS BECAUSE IT HAS NEVER EVEN SOLD, LET ALONE GENERATED NET PROFITS.**

13

14   As noted above, RLS requires regulatory approval from the mining regulator of each

15   country before it can be used by mine operators and RLS has never received this approval.

16   (Grasser Decl., Ex. G at 26:14-22.)  In other words, it cannot be installed in mines in the U.S. or

17   anywhere else in the world.[14]  (Grasser Decl., Ex. G at 39:6-10; 85:7-11.)  As a result, it has never

18   been commercially sold (other than *de minimis* sales of prototypes).  (Grasser Decl., Ex. G at

19   99:22-100:1; Ex. H at 177:22-178:9.  In this respect, RLS is essentially a new, un-established

20   business.  Indeed, there are no net profits here to share, and even if Barrett had a viable claim to

21   them – which he does not – Barrett can offer no evidence to show, with reasonable certainty, that

22   it will ever generate a profit.

23   And it is far more difficult to show a reasonable certainty of profits with a business that is

24   new or not yet established.  Indeed, such damages "are generally not recoverable because their

25

26   ---

   [14] Furthermore, it is a guessing game as to when, if ever, final regulatory approval will come.  (Grasser

27   Decl., Ex. I at 198:6-12 ("we've had so many problems and delays with MSHA that it's impossible to accurately determine exactly what is going on behind the closed door at MSHA and how long it will take

28   them at . . . any given point to conclude their evaluation.")  In addition, Barrett has proffered no expert opinion on this issue.

occurrence is uncertain, contingent and speculative." *Parlour Enterprises, Inc*., 152 Cal. App. 4th at 287-288.  The loss of profits from a new business "may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like." *Id*.  An expert must rely on evidence of profits generated in circumstances that share "a substantial similarity between the facts forming the basis of the profit projections and the business opportunity that was destroyed." *Id*. at 288.  The expert must further "support [his opinions with] tangible evidence with a 'substantial and sufficient factual basis' rather than by mere 'speculation and hypothetical situations.'" *Id*. at 288.

Thus, as a predicate matter, Barrett must prove that there would have been sales of RLS. Without that proof his claim fails: "[T]here can be no recovery of damages if the fact that a monetary loss was sustained is left in doubt." *Patton v. Royal Industries, Inc.*, 263 Cal. App. 2d 760, 768 (1968) ("There was no way in which the plaintiffs could prove the business they launched for themselves would have been a success if the defendants had not interfered with it. The right to recover damages cannot be left to speculation, and the prospect [of] success in their new venture was purely speculative and wholly without a factual basis.").

Here, no such proof exists.  On the contrary, with respect to RLS, all that exists were possible plans to make sales – not even sale contracts.  Mere plans – even when there is a contract in place (and there is not here) – are insufficient to support a claim for lost profits.  *See Greenwich S.F., LLC*, 190 Cal. App. 4th at 763 ("The existence of plans for a development does not supply substantial evidence that the development is reasonably certain to be built, much less that it is reasonably certain to produce profits.").  There is no certainty that any profits would have been generated at all.  *See Maggio*, 227 Cal. App. 3d at 870 ("Damages for loss of profits may be denied to an 'unestablished' or new business as being too uncertain and speculative if they cannot be calculated with reasonable certainty.").  Indeed, the Ninth Circuit has gone so far as to contemplate whether there is a *per se* rule in California against awarding damages based on agreements to agree or letters of understanding.  *Vestar Dev. II, LLC v. Gen. Dynamics Corp*., 249 F.3d 958, 962 (9th Cir. 2001) (not reaching the issue because the Ninth Circuit found that

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

1   there could be no reasonable certainty as to future profits from the pending deal in that case)

2   (*citing Auerbach v. Great Western Bank*, 74 Cal. App. 4th, 1172, 1191-92 (1999) ("Without some

3   basis for calculating the actual financial benefit [from an agreement to agree], the damages

4   awarded by the jury . . . are the result of pure speculation and cannot be sustained.")); *accord*

5   *Hathaway Dinwiddie Constr. Co. v. United Air Lines, Inc.*, 50 Fed. Appx. 817, 822 (9th Cir.

6   2002) (affirming summary judgment where damage claim was predicated on an inherently

7   speculative failure to continue to negotiate).  As in *Vestar*, this Court also need not address that

8   issue as there is no evidence to support a reasonable certainty of future profits here either.  In fact,

9   Barrett cannot even attempt to, let alone succeed, in showing with any reasonable certainty that a

10  similarly situated company – pending regulatory approval for its proposed product – would

11  generate profits. *See Kids' Universe*, 95 Cal. App. 4th at 888 (Affirming summary judgment

12  against claims where "Plaintiffs presented no specific economic or financial data, market survey,

13  or analysis based on the business records or operating histories of similar enterprises.").  Thus,

14  Barrett's claim fails for lack of reasonably certain damages.[15]

15          **3.      BARRETT'S DAMAGES CLAIMS FAIL FOR LACK OF EXPERT TESTIMONY.**

16          Rather than present evidence that establishes that he has been damaged, Barrett purports

17  to present expert testimony that merely performs mechanical calculations by assuming that

18  certain purported sales commitments had come to fruition in 2013 (when the RLS system could

19  not even be sold).  For the reasons stated in the concurrently-filed Motion to Exclude the

20  Testimony of Scott Hampton, which is hereby incorporated in full, Scott Hampton's testimony

21  should be struck and cannot support Barrett's claims.  Accordingly, because of Barrett's inability

---

[15] The outcome is not different under Washington law, where profits from new businesses must also be demonstrated with a reasonable certainty.  *See Milgard Tempering v. Selas Corp. of Am.*, 902 F.2d 703, 710-11 (9th Cir. Wash. 1990) (citing *Alpine Indus., Inc. v. Gohl*, 30 Wash. App. 750, 637 P.2d 998, 1001 (1981), *opinion changed*, 645 P.2d 737 (Wash. App. 1982)).  For all the reasons stated above, Barrett's claims fail equally under Washington law.  *See Peoples Bank v. Bluewater Cruising LLC*, Case No. C12-00939RSL, 2014 U.S. Dist. LEXIS 6428 at *43-44 (W.D. Wash. Jan. 17, 2014) (granting summary judgment where "[a]t best, the evidence presented suggested that [claimant] was aware of other people who, at one time or another, expressed interest in [the goods for sale]" and therefore the evidence was "too speculative to show the existence of damages.").

Case5:13-cv-03384-PSG   Document63   Filed10/21/14   Page31 of 31

1   to adduce evidence of damages on any of his claims, Plaintiffs are entitled to summary judgment

2   on each of Barrett's counterclaims.  *See, e.g., Planet Goalie*, 2013 U.S. Dist. LEXIS 57499.

3   **V.**     **CONCLUSION**

4          Upon the evidence submitted herewith and upon the reasoning and authorities set forth

5   above, Plaintiffs are entitled to summary judgment on all three of their claims for declaratory

6   relief and summary judgment dismissing James Barrett's counterclaims.

7   Dated: October 21, 2014                    SQUIRE PATTON BOGGS (US) LLP

8                                              By: /s/ *Joseph P. Grasser*

9                                                 David S. Elkins
                                                  Joseph P. Grasser

10                                             Attorneys for Plaintiffs and
11                                             Counterclaim Defendants
                                               VENTURE CORPORATION LTD and
12                                             VENTURE DESIGN SERVICES, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

-25-
PLAINTIFFS' MEMO. ISO MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 13-03384 PSG (ADR)