UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| VENTURE CORPORATION LTD., et al., | Case No. 5:13-cv-03384-PSG |
| Plaintiffs and Counterdefendants, | **ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE TESTIMONY** |
| v. | |
| JAMES P. BARRETT, | **(Re: Docket Nos. 63, 65, 66)** |
| Defendant and Counterclaimant. | |

Few professions pose greater danger to life and limb than mining. Think Benxihu Colliery. Monongah. Upper Big Branch. In the immediate aftermath of these as well as other, less infamous mining disasters, time is precious.

Defendant and Counterclaimant James P. Barrett is named inventor on two United States patents and one patent application aimed at improving the odds of surviving such disasters. That much Barrett and Plaintiffs and Counterdefendants Venture Corporation Ltd. and Venture Design Services, Inc. agree on. Beyond that, they do not agree on much. After Barrett claimed he owned the patents and application despite an agreement to assign certain inventions he signed as a condition of his employment for VDSI, the Ventures filed this suit for a declaration that the patent

1

Case No. 5:13-cv-03384-PSG
ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE
TESTIMONY

and all other rights in the inventions in fact belong to VCL.[1]  Barrett not only disputes the Ventures' claims but asserts his own counterclaims under California law.[2]

Because the parties' disagreements are genuine and go to material facts underlying each of the claims in this case, and a reasonable jury could resolve these disagreements in either side's favor, the court DENIES the parties' respective motions for summary judgment.  The court also DENIES the Ventures' motion to exclude testimony from Scott Hampton, Barrett's damages expert.

# I.

Even though patents are creatures of federal law, state law nevertheless plays an important role when it comes to patent ownership disputes.  "Usually, federal law is used to determine the validity and terms of an assignment," but patent ownership is determined by state law.[3]  In California, Labor Code § 2870 provides that:

> (a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:
>    (1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or
>    (2) Result from any work performed by the employee for the employer.
> (b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

---

[1] *See* Docket No. 1.

[2] *See* Docket No. 11.

[3] *Sky Technologies LLC v. SAP AG,* 576 F.3d 1374, 1379 (Fed. Cir. 2009); *see also Network Prot. Sciences, LLC v. Fortinet, Inc.*, Case No. 3:12-cv-01106-WHA, 2013 WL 4479336, at *4 (N.D. Cal. Aug. 20, 2013).

2
Case No. 5:13-cv-03384-PSG
ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE TESTIMONY

VDSI is a California-based corporation. On November 1, 2003 Barrett began working for VDSI after VDSI acquired the business of Barrett's previous employer. As a condition of his employment, Barrett signed an "Inventions Agreement."[4] The Inventions Agreement contains several key provisions relating to the disclosure of any inventions and the assignment to VDSI of Barrett's rights to any such invention. With regard to disclosure, Section 3.1 provides:

> [Barrett] will disclose promptly to the proper officers or attorneys of the Company in writing any idea, invention, work of authorship (including, but not limited to, computer programs, software and documentation), formula, device, improvement, method, process or discovery, whether or not patentable or copyrightable (any of the foregoing items hereinafter referred to as an "Invention"), [he] may conceive, make, develop or work on, in whole or in part, solely or jointly with others during the term of [his] employment with the Company. The disclosure required by this Section applies: (a) during the term of my employment and for six months thereafter; (b) during my regular hours of employment and to my time away from work; (c) whether or not the Invention was made at the suggestion of the Company; (d) whether or not the Invention was reduced to drawings, written description, documentation, models or other tangible form; and (e) to any Invention which, in the opinion of the Company, is related to the company because it is related:
>
> i. to the general line of business engaged in by the Company;
> ii. to any actual or anticipated business (including research and development) of the Company; or
> iii. to suggestions made by the Company or which resulted from any work assigned by or performed for the Company.[5]

Section 3.2, which covers the assignment of rights to which Barrett agreed, provides that:

> [Barrett] hereby assign[s] to the Company without royalty or any other further consideration my entire right, title and interest in and to any Invention [Barrett is] required to disclose under Section 3.1; provided, that [Barrett] acknowledge[s] and agree[s] that the Company has hereby notified me that the assignment provided for in this Section 3.2 does not apply to any Invention which qualifies fully for exemption from assignment under the provisions of Section 2870 of the California Labor Code, a copy of which is attached hereto as Exhibit 3.2.[6]

---

[4] *See* Docket No. 11 at ¶ 15.

[5] Docket No. 1-4 at 1-2.

[6] *Id.* at 2.

3
Case No. 5:13-cv-03384-PSG
ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE TESTIMONY

In 2005, Barrett disclosed the first of the three inventions in dispute in this case.[7] Barrett says these three inventions were conceived and reduced to practice before he began work at VDSI. The parties refers to the inventions as "MineTracer," U.S. Patent No. 8,294,568; a "Toxic Gas Removal and Air Conditioning System for Human Life Support in Enclosed Refuge Spaces" (the "Gas Scrubbing" system), U.S. Patent Application No. US2012/0304866A1; and "Gas Monitoring System with Oxygen Control for Human Life Support in Enclosed Refuge Space" (the "Gas Monitoring" system), U.S. Patent Application No. US2013/0153060A1.[8] According to Barrett, his purpose in disclosing these inventions and later assigning all patent rights in these inventions was not to satisfy any obligation to VDSI under Section 3.2 of the Inventions Agreement, as the Ventures claim, but rather as part of a separate joint venture he agreed to with VCL, VDSI's parent corporation.[9] In any event, after VDSI terminated Barrett in 2013, Barrett asserted that his patent assignments to VCL were not effective.[10]

The Ventures then filed suit for a declaration that Barrett has no ownership or other rights in either the patent or the patent applications.[11] Barrett counterclaimed, alleging: breach of fiduciary duty arising from a joint venture; repudiation of a joint venture; conversion; breach of contract; breach of the implied covenant of good faith and fair dealing; unjust enrichment;

---

[7] *See* Docket No. 11 at 3.4.

[8] *See* Docket No. 11 at 3.1-3.3.

[9] *See id.* at 3.8.  During the course of this case, the Patent and Trademark Office issued U.S. Patent Application No. US20120304866A1 as U.S. Patent No. 8,858,688.  *See* Docket No. 86 at 1 n.1.

[10] *See* Docket No. 1 at ¶¶ 2, 23; Docket No. 66 at 13; Docket No. 87 at 17.

[11] *See* Docket No. 1.

4
Case No. 5:13-cv-03384-PSG
ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE TESTIMONY

constructive fraud and actual fraud.[12]  Each counterclaim seeks as its remedy one-half of profits that the Ventures made based on sales of products embodying the inventions.[13]

**II.**

This court has jurisdiction under 28 U.S.C. §§ 1331, 1367 and 2201.  The parties have consented to magistrate judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 72(a).

Pursuant to Fed. R. Civ. P. 56(a), the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[14]  At the summary judgment stage, the court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial."[15]  Material facts are those that may affect the outcome of the case.[16]  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.[17]

**III.**

A fundamental issue underlying each of the Venture's claims is whether Barrett assigned to VDSI all his rights in the patent and applications when he executed the Inventions Agreement.  To be sure, the evidence is undisputed that Barrett worked on his inventions during his term of

---

[12] *See* Docket No. 11.

[13] *See* Docket No. 38 at 54-55, ¶¶ 8.1-8.5 (describing the relief sought).

[14] Fed. R. Civ. P. 56(a).

[15] *House v. Bell*, 547 U.S. 518, 559–60 (2006).

[16] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").

[17] *See id.*

5
Case No. 5:13-cv-03384-PSG
ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE TESTIMONY

employment. Barrett all but concedes this point in his papers.[18] Under Section 3.1 of the agreement, Barrett therefore was obligated to disclose the invention to VDSI, which it is undisputed that he did. It also is undisputed that under Section 3.2, Barrett assigned all such inventions unless otherwise precluded by law from doing so.[19] But it is genuinely disputed whether Barrett was precluded under Section 2870 from assigning his inventions because he developed them entirely on his own time and they did not relate to VDSI's business at the time he conceived them or reduced them to practice. As with key disputes underlying Barrett's waiver, estoppel, forfeiture, laches, statute of limitations and choice of law defenses, as well as his counterclaims, these genuine disputes as to preclusion of assignment require a trial to resolve.[20]

*First,* there is a genuine dispute whether under Section 2870 Barrett developed his inventions entirely on his own time. Barrett offers substantial evidence that he both conceived and reduced to practice all three inventions before he began working at VDSI. Beyond his declaration to that effect,[21] in 2006, during the initial patenting process of MineTracer, he wrote into a

---

[18] *See* Docket No. 81 at 16:15.

[19] *See DDB Techs. LLC v. MLB Advanced Media, L.P.,* 517, F.3d 1284, 1290 (Fed. Cir. 2008).

[20] California law including Section 2870 applies to Barrett, the Inventions Agreement and all the claims and counterclaims at issue. Section 5.1 of the agreement explicitly recites that it "shall be construed and governed by the laws of the State of California." Barrett nevertheless contends that Washington law governs the agreement, and that Washington law invalidates the agreement's automatic assignment of inventions. To resolve such disputes, the Ninth Circuit requires that trial courts look to the law of the forum state—here, California—in applying choice of law principles. *See, e.g., Hatfield v. Halifax PLC*, 564 F.3d 1177, 1182 (9th Cir. 2009). Under California law, a choice of law clause will be enforced if either there is a substantial relationship between California and the parties or if any other reasonable basis for the choice of California law exists. *See, e.g., id.* (enforcing a choice of law clause on behalf of a third party beneficiary as to all claims). VDSI is a California corporation, thus satisfying the substantial relationship test. *Id.* at 1183. And Barrett can identify no existing contrary indication that the parties' choice of California law was otherwise unreasonable. *See, e.g., Gravquick A/S v. Trimble Nav. Int'l*, 323 F.3d 1219, 1224 (9th Cir. 2003) (finding the application of California law to a contract involving a California corporation but performed partially in California and partially elsewhere was not unreasonable).

[21] *See* Docket No. 83 at ¶ 12.

6
Case No. 5:13-cv-03384-PSG
ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE TESTIMONY

disclosure to the Ventures' patent counsel: "I have conceived and reduced the core invention to practice on my own time, and with my own resources. Venture has agreed to help develop it further for commercialization."[22] No response disputing the claim was tendered.

On December 17, 2008, VCL offered and Barrett signed an assignment of Barrett's rights to VCL for the MineTracer Tracker system. This was to be an exchange for consideration.[23] In their proffered contract, VCL represented to Barrett that it "wishe[d] to acquire" his entire right, title, and interest in his application, inventions and any patents.[24] There was no mention of any mandatory assignment obligation. The contract reads: "NOW THEREFORE, for good and valuable consideration acknowledged by said Assignor to have been received in full from as Assignee: 1. Said Assignor does hereby sell, assign, transfer, and convey to said Assignee, the entire right, title, and interest . . ." in all of Barrett's patents.[25] The parties agreed that this assignment was to be effective January 1, 2008.[26] Soo Hiong, VCL's director, accepted this assignment as written.[27] VCL recorded this formal written assignment on January 25, 2011 in the United States Patent and Trademark Office, identifying the date of assignment as the date of the assignment contract—December 17, 2008.[28] The same contract was redone and recorded a second time.[29]

---

[22] Docket No. 83 at ¶ 17, Docket No. 83-1 at Ex. 1-15 at ¶ 26.

[23] *See* Docket No. 83-2, Ex. 1-44 at ¶ 43.

[24] *See id.*

[25] *Id.* at ¶ 1.

[26] *See id.* at ¶ 43; *id.* at Ex. 1-45 at ¶ 5.

[27] *See id.* at Ex. 1-46 at ¶ 46.

[28] *See id.* at Ex. 1-15 at ¶ 47-48.

[29] *See id.* at Ex. 1-60 at ¶ 50.

7
Case No. 5:13-cv-03384-PSG
ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE TESTIMONY

Five years later, in a January 14, 2011 email chain, VCL corporate IP counsel Cathryn Chang reminded Barrett of confidentiality needs for what she characterized as "your invention," and discussing e.g. "if you disclosed your idea in a public setting before filing a patent, you lost the rights to a PCT patent coverage," "disclose your invention," and "when sharing your invention."[30] On May 24, 2011, the Ventures' outside patent counsel Craig Stainbrook, VCL corporate counsel Angeline Khoo, and Chang, with all communication copied to VCL Executive Vice President and VDSI President Lee Ghai Keen, confirmed with each other and with Barrett that no contractual obligation existed requiring Barrett to assign his inventions to VDSI.[31]  In this communication, Stainbrook made it clear to all parties that if any assignment obligation to VDSI existed, it could not be bypassed in the ensuing contractual process between Barrett and VCL.[32]  Barrett replied, "I know of no reason that I am contractually obligated to assign first to VDSI."[33]  This was forwarded to VDSI's Bob Armantrout.  Armantrout did not challenge Barrett's statement.  Barrett tenders similar evidence regarding the two other inventions.

Even certain evidence offered by the Ventures supports the notion that Barrett developed the invention before joining VDSI.  In particular, under the agreement, Barrett had an option he did not exercise "to attach to Schedule 3.5B of this Agreement a brief description of all Inventions made or conceived by me prior to my employment with the Company which [Barrett] desire[s] to be excluded from this Agreement."[34]  If one only need exclude what is subject to the agreement, that Barrett did not attach anything is consistent with the inventions not being subject to the

---

[30] Docket No. 83 at ¶ 27, Docket No. 83-9 at Ex. 5-15.

[31] *See* Docket No. 83 at ¶¶ 18, 20, 21; Docket No. 83-10, Ex. 6-1, 6-2; Docket No. 63-1, at 1, 2.

[32] *Id.* at 19.

[33] Docket No. 83-10, Ex. 6-1 at 11:30 a.m.

[34] Docket No. 1-4 at 2-3, 6.

8
Case No. 5:13-cv-03384-PSG
ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE TESTIMONY

agreement in the first place.[35] A jury hearing this could reasonably conclude that Barrett developed the invention before joining VDSI and therefore entirely on his own time.

The Ventures counter with other evidence that Barrett worked to commercialize the inventions well after he joined VDSI.[36] But commercialization of inventions after they are developed is not the same as development of the inventions themselves for purposes of Section 2870.[37] Other evidence offered by the Ventures might carry the day in proving that Barrett did more than just commercialize his inventions while working at VDSI.[38] A reasonable jury need not, however, accept only the evidence of one party and not the others.

***Second,*** there is a genuine dispute under Section 2870 whether Barrett's inventions related to VDSI's business at the time of conception or reduction to practice. Even assuming that Section 2870 contemplates such a relationship before the inventor begins work for his employer,[39] the record here is decidedly mixed. VDSI's business did not include any mining products or technology.[40] While the Ventures are right that California courts have interpreted the "related to" phrase in Section 2870 broadly,[41] a reasonable jury could conclude that at the time of Barrett's

---

[35] *See also* Docket No. 64-4 at 156:19-157:81 (Barrett testifying at deposition that none of the essential components of his inventions was developed after he joined VDSI).

[36] *See, e.g.* Docket No. 64-4 at 61:4-10, 77:24-79: 64-1 at 8:25-9:6.

[37] *See Applera Corp.--Applied Biosystems Group v. Illumina, Inc.*, Case No. 3:07-CV-2845-WHA, Docket No. 88 at 7 (N.D. Cal. Jan. 17, 2008), *aff'd*, 375 Fed. Appx. 12 (Fed. Cir. 2010).

[38] *See, e.g.* Docket No. 64-4 at 202:3; Docket No. 64-6 at BAR 150, 154; Docket No. 64-7 at 5; Docket No. 64-8 at BAR 75, 82-83.

[39] *Cf. Cadence Design Sys., Inc.*, Case No. 3:07-cv-00823-MHP, 2007 U.S. Dist. LEXIS 83078, at *17-19 (N.D. Cal. Nov. 8, 2007) (employee invention developed during term of employment); *Iconix, Inc. v. Tokuda*, 457 F. Supp. 2d 969, 991-2 (N.D. Cal. 2006) (same).

[40] *See* Docket No. 83 at ¶¶ 4-6, 9-10.

[41] *See e.g., Cubic Corp. v. Marty*, 185 Cal. App. 3d 438, 452 (1986).

conception and reduction to practice, the inventions were so untethered to VDSI's back-end remote monitoring technologies that they did not relate.

***Third***, Barrett's affirmative defenses and counterclaims similarly require a trial. At the heart of each is Barrett's contention that he entered into a joint venture with VCL as consideration for his assignments of patent rights. "The three basic elements of a joint venture are: (1) the members must have joint control over the venture (even though they may delegate it); (2) the members must share the profits of the undertaking; and (3) the members must each have an ownership interest in the enterprise."[42]

The parties again offer mixed evidence on genuinely disputed issues. Barrett offers his take on the evidence, especially deposition testimony from Lee that does not dispute the existence of the joint venture: "[a]ll reasonable inferences from this evidence show an undertaking between the parties to carry out a single enterprise for profit. Barrett would develop the technologies and generate revenue, and VCL would provide funding, all in the expectations of recovering 'millions of dollars of profit.'"[43] Meanwhile, Lee and other VDSI and VCL executives most actively engaged with Barrett during the relevant time offer a different take.[44] Similarly, while Barrett points to evidence of the Ventures' history of handshake deals, the Ventures point to their practice of papering such deals and the absence of even a single document evidencing the alleged venture.[45] Finally, Barrett asserts that "VCL initially had no ownership interest in the enterprise, as reflected

---

[42] *McKay v. Hageseth*, Case No. 3:06-cv-1377-MMC, 2007 U.S. Dist. LEXIS 66301 at *13 (N.D. Cal. Sept. 7, 2007) (quoting *Jeld-Wen, Inc. v. Superior Court*, 131 Cal. App. 4th 853, 32 Cal. Rptr. 3d 351 (2005) (internal quotation and citation omitted)); *accord*, *In re Yan*, 381 B.R. 747, 753 (N.D. Cal. 2007).

[43] Docket No. 66 at 27.

[44] *See* Docket No. 86-3 at ¶ 3; Docket No. 86-4 at ¶¶ 9, 11.

[45] *See* Docket No. 86-4 at ¶ 10.

10
Case No. 5:13-cv-03384-PSG
ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE TESTIMONY

by the assignments, until Barrett gave VCL ownership rights by assignment."[46] As discussed above, a reasonable jury could find that, because Section 2870 does not apply, Barrett assigned his inventions by operation of the Inventions Agreement.

The waiver, laches and limitations defense further require a trial because of, at a minimum, the genuinely disputed issue of whether Barrett gave notice that he was acting as a joint venturer and not a VDSI employee.[47]

***Fourth***, there are genuinely disputed issues regarding Barrett's damages claims. Where a jury finds that a joint venture exists between a plaintiff and defendants, where the proceeds from that venture were to be divided in a particular manner, and where one party wrongfully repudiated or breached the agreement and converted all of the joint venture assets to themselves, and excluded the other party therefrom, then recovery at law is for all of the damages which result, including damages for profits which were "prevented" by the wrongful action.[48] The party who is excluded recovers not only his interest, "*but also his share of the profits which might have been made during the term.*"[49]

The Ventures seek summary judgment based on what they say is undisputed evidence that they never made a profit on the inventions. In fact, with respect to Refuge Life Support products, the Ventures claim to have never made a commercial sale.[50] But Barrett points to evidence from the Ventures' own Rule 30(b)(6) witness that confirms that suggests as early as 2007, VCL had recovered all its investment from sales except for $700,000 and that from then until 2013, there

---

[46] Docket No. 66 at 27.

[47] *Cf.* Docket No. 69 at 7-15; Docket No. 83-10, Ex. 6-1 at 11:30 a.m.

[48] *See Gherman v. Colburn*, 72 Cal. App. 3d 544, 562, 557, 561 (1977).

[49] *Id.* at 562 (emphasis in original).

[50] *See* Docket No. 64-9 at 26:14-22, 39:6-10, 85:7-11, 99:22-100:1; Docket No. 64-10 at 177:22-178:9.

were another $11.6 million in MineTracer sales.[51]  With respect to the RLS products, Barrett offers evidence of pre-sales distribution rights that VCL sold in July 2013.[52]  While the Ventures offer their take on this evidence,[53] a reasonable jury could reject this take in favor of Barrett's.

*Fifth*, there is no basis upon which to exclude Hampton's expert testimony.  Expert testimony is generally admissible if it is supported by the record[54] and by a preponderance of the evidence,[55] is relevant,[56] reliable[57] and assists the trier of fact.[58]  Once an expert meets the threshold that Fed. R. Evid. 702 establishes, the expert may testify and it is up to the jury to decide how much weight to give that testimony.[59]

---

[51] *See* Docket No. 82-1, Ex. 1 at 64:16-25; 189:20-190:19.

[52] *See* Docket No. 66 at 13, n.1.

[53] *See, e.g.,* Docket No. 61-1 at ¶¶ 8-9; Docket No. 63-1 at 6.

[54] *See Russell v. Sullivan*, 930 F.2d 1443, 1445 (9th Cir. 1991) ("If the assumptions in the hypothetical are not supported by the record, the vocational expert's opinion that a claimant is capable of working has no evidentiary value"); *California Diesel & Equipment, Inc. v. Sun Exploration & Production Co.*, Case Nos. 89-cv-55623, 89-55720, 1990 U.S. App. LEXIS 19785 at *15 (9th Cir. Nov. 7, 1990 ("[E]xpert testimony provides sufficient proof only if it is 'based upon tangible evidence rather than mere speculation or hypothseses.'").

[55] *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1988).

[56] *See Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 590 (1993) (holding proposed testimony must "logically advance a material aspect of the proposing party's case").

[57] *See* Fed. R. Evid. 702 (""if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case"); *Daubert v. Merrill Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) (*citing Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. 137, 149 (1999) (requiring only a "reliable basis in the knowledge and experience of the relevant discipline") (citations and alterations omitted).

[58] *See United States v. Freeman,* 498 F.3d 893, 905 (9th Cir. 2007) ("Rule 702 'makes inadmissible expert testimony as to a matter which obviously is within the common knowledge of jurors because such testimony, almost by definition, can be of no assistance'") (quoting *Scott v. Sears, Roebuck & Co.*, 789 F.2d 1052, 1055 (4th Cir. 1986)).

[59] *See Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010); *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014 (applying FRE 702 with a "liberal thrust favoring admission").

Even as they acknowledge his general qualifications as a forensic accountant,[60] the Ventures object that Hampton[61] uses methodologically unsound simple math based on unrealistic speculation and conjecture from Barrett himself.[62] The Ventures are particularly concerned with Hampton's reliance on contingent offers and sales commitments in calculating lost profits owed to Barrett, especially if Barrett characterizes Hampton's testimony as a valuation of the inventions.[63] But contingencies in offers do not necessarily render expert evidence unreliable or inadmissible.[64] Barrett characterizes the projections as offers VCL could have taken advantage of, even if they did not.[65] Hampton based his testimony on tangible evidence: written letters, memoranda of understanding, and VCL's own published figures and facts.[66] His opinions are relevant to the calculation of joint future damages.[67] While the Ventures have identified a number of flaws in Hampton's analysis, none renders the analysis so unreliable that exclusion under Rule 702 is required. Any flaws in Hampton's testimony are properly challenged through cross-examination at trial.[68]

---

[60] *See* Docket No. 88 at 4.

[61] *See* Docket No. 65-2.

[62] *See* Docket No. 65 at 2, 5, 8, 10-14.

[63] *See* Docket No. 88 at 3.

[64] *See Navarro v. Perron*, 19 Cal. Rptr. 3d 198, 201 (2004) (citing *Gherman*, 72 Cal. App. 3d at 562).

[65] *See* Docket No. 84 at 8, 17; *contra Vestar Dev. II, LLC v. Gen. Dynamics Corp.*, 249 F.3d 958, 962 (9th Cir. 2001) (regarding good faith negotiation efforts).

[66] *See* Docket No. 84 at 7.

[67] *See id.*

[68] The court sustains the Ventures' objections to legal arguments in Hampton's declaration, *see* Docket No. 85, as well as Hampton's undisclosed reliance on Bret Romrell, *see* Docket No. 65-2. The court relies on neither in this order. All other evidentiary objections are overruled.

### IV.

The parties shall appear for a final pretrial conference as previously scheduled on January 13, 2015 at 10:00 a.m. Trial will commence on January 26, 2015 at 9:00 a.m.

**SO ORDERED.**

Dated: December 17, 2014

_____
PAUL S. GREWAL
United States Magistrate Judge