David S. Elkins (State Bar # 148077)
david.elkins@squirepb.com
Joseph P. Grasser (State Bar # 255156)
Rafael Langer-Osuna (State Bar # 300948)
SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304
Telephone: +1 650 856 6500

Sarah K. Rathke (*pro hac vice* pending)
sarah.rathke@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
4900 Key Tower, 127 Public Square
Cleveland, Ohio 44114
Telephone: +1 216 479 8500

Attorneys for Plaintiffs and Counterclaim
Defendants VENTURE CORPORATION LTD and
VENTURE DESIGN SERVICES, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| VENTURE CORPORATION LTD and VENTURE DESIGN SERVICES, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>JAMES P. BARRETT,<br><br>Defendant.<br><br>And Related Counterclaim | Case No. CV 13-03384 PSG (ADR)<br><br>**PLAINTIFFS VENTURE CORPORATION LTD'S AND VENTURE DESIGN SERVICES, INC.'S TRIAL BRIEF**<br><br>Trial Date: May 26, 2015<br>Time: 9:30 a.m.<br>Pretrial Conf: May 5, 2015<br>Time: 1:30 p.m.<br>Place: Courtroom 5 - 4th Floor<br>Judge: Hon. Paul Singh Grewal |

**TABLE OF CONTENTS**

| | | | Page |
|---|---|---|---|
| I. | INTRODUCTION | | 1 |
| II. | FACTUAL BACKGROUND | | 2 |
| | A. | Venture Purchases The Research And Development Center Where Barrett Worked, And Barrett Accepts Employment With VDSI Pursuant To The Inventions Agreement | 2 |
| | B. | The Relevant Sections Of The Inventions Agreement Show That Barrett Assigned Any Invention That He Developed During His Employment To VDSI | 3 |
| | C. | The Liberty Lake Research And Development Team, Under Barrett's Supervision, Conceive, Develop And Commercialize The Inventions In The Course Of Their Employment And Using VDSI Resources | 5 |
| | D. | The Products Embodying The Inventions Have Not Generated A Profit | 5 |
| III. | DISCUSSION | | 6 |
| | A. | California Law Governs This Dispute | 6 |
| | B. | Barrett Cannot Own Any of the Inventions Because The Liberty Lake Team, Under His Supervision, Created Them As Employees of VDSI | 6 |
| | C. | The Inventions Are Not Within the Exception Created by Labor Code Section 2870 | 7 |
| | D. | Barrett's Alleged "Joint Venture" Is an Impermissible Modification of the Inventions Agreement | 8 |
| | E. | Because Venture Always Owned the Inventions, Barrett's Claims Must Fail | 9 |
| | F. | Barrett Cannot Prove Damages With Reasonable Certainty | 9 |
| | | 1. Barrett's Claim for Damages for the MineTracer Product Must Fail Because that Product Never Generated Net Profits | 11 |
| | | 2. Barrett's Claim for Damages for The RLS Product Must Fail Because The RLS Product Has Never Been Sold, Let Alone Generated Profits | 12 |
| IV. | CONCLUSION | | 14 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brewer v. Indymac Bank*,
    609 F. Supp. 2d 1104 (E.D. Cal. 2009) ................................................................................ 9, 10

*Brother Records v. Jardine*,
    318 F.3d 900 (9th Cir. 2003) ....................................................................................................12

*Cadence Design Sys., Inc. v. Bhandari*,
    Case No. C 07-00823 MHP, 2007 U.S. Dist. LEXIS 83078 (N.D. Cal. Nov. 8,
    2007) ..................................................................................................................................... 4, 7

*Clear Channel Outdoor, Inc. v. Bently Holdings Cal. LP*,
    No. C-11-2573 EMC, 2011 U.S. Dist. LEXIS 140764 (N.D. Cal. Dec. 7, 2011) ................ 9, 10

*Cubic Corp v. Marty*,
    185 Cal. App. 3d 438 (1986) ................................................................................................. 7, 8

*DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*,
    517 F.3d 1284 (Fed. Cir. 2008) ..................................................................................................1

*Erlich v. Menezes*,
    21 Cal. 4th 543 (Cal. 1999) ........................................................................................................9

*Food Safety Net Services v. Eco Safe Systems USA, Inc.*,
    209 Cal. App. 4th 1118 (2012) .................................................................................................12

*Graham-Sult v. Clainos*,
    756 F.3d 724 (9th Cir. 2014) ................................................................................................ 9, 10

*Greenwich S.F., LLC v. Wong*,
    190 Cal. App. 4th 739 (2010) ............................................................................................ 11, 13

*Iconix, Inc. v. Tokuda*,
    457 F. Supp. 2d 969 (N.D. Cal. 2006) .......................................................................................7

*Kids' Universe v. In2Labs*,
    95 Cal. App. 4th 870 (2002) .....................................................................................................12

*Maggio, Inc. v. UFW*,
    227 Cal. App. 3d 847 (1991) ............................................................................................. 10, 13

*Marani v. Jackson*,
    183 Cal. App. 3d 695 (1986) ......................................................................................................8

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Martinez v. Welk Group, Inc.*,
   907 F. Supp. 2d 1123 (S.D. Cal. 2012) ................................................................9, 10

*Parlour Enterprises, Inc. v. Kirin Group, Inc.*,
   152 Cal. App. 4th 281 (2007) ............................................................................11, 12

*Patton v. Royal Industries, Inc.*,
   263 Cal. App. 2d 760 (1968) ....................................................................................13

*Piscitelli v. Friedenberg*,
   87 Cal. App. 4th 953 (2001) .....................................................................................10

*Planet Goalie, Inc. v. Monkeysports, Inc.*,
   No. CV 11-07263 RZ, 2013 U.S. Dist. LEXIS 57499 (C.D. Cal. Apr. 22, 2013) ......9

*Sargon Enterprises, Inc. v. University of Southern California*,
   55 Cal. 4th 747 (2012) .............................................................................................11

*Tyrone Pacific International, Inc. v. MV Eurychili*,
   658 F.2d 664 (9th Cir. 1981) ....................................................................................10

*Vacchiano v. Wessell*,
   No. CV 12-2003 DSF, 2014 U.S. Dist. LEXIS 39554 (C.D. Cal. Mar. 24,
   2014) ....................................................................................................................9, 10

*Vestar Dev. II, LLC v. Gen. Dynamics Corp.*,
   249 F.3d 958 (9th Cir. 2001) ....................................................................................13

**Statutes**

Cal. Lab. Code § 2870 ..............................................................................................4, 6, 7, 8

**Other Authorities**

U.S. Patent No. 8,294,568 .....................................................................................................2

U.S. Patent No. 8,858,688 .....................................................................................................2

## I. INTRODUCTION

This action centers on defendant and counterclaimant James P. Barrett's claims that he is due profits from plaintiffs and counterclaim defendants Venture Corporation Ltd.'s ("VCL") and Venture Design Services, Inc.'s ("VDSI") (collectively "Venture") sales of products embodying three inventions[1] that Barrett, along with a research and development team that he oversaw, conceived of and developed in the course of their employment with VDSI. Venture contends that Barrett assigned the Inventions to VDSI, who in turn assigned them to VCL, upon conception pursuant to Barrett's Employee Confidential Information and Inventions Agreement ("Inventions Agreement"), which he signed as a condition of his employment. As detailed below, (1) Barrett created the Inventions as a member of a team of VDSI employees, (2) he used VDSI resources to develop the Inventions, and (3) all three inventions related to VDSI's wireless network systems business. Thus, VDSI obtained title to each invention upon its creation by operation of law pursuant to the Inventions Agreement. *See, e.g.*, *DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008) (if the contract expressly grants rights in future inventions, no further act is required once an invention comes into being, and the transfer of title occurs by operation of law).

Barrett contends that he conceived of and reduced to practice the Inventions on his own time and prior to his employment with VDSI – purportedly in the span of the three months in 2003 between discovering that he would work for VDSI and actually beginning work for VDSI. He further contends that he entered into an oral joint venture with VCL, the parent company of his employer, pursuant to which Venture would not only pay him half of all profits derived from sales of products embodying the Inventions but also would purchase the Inventions from him (at some undefined point in the future and at a to-be-determined price). Barrett has confirmed that no writing exists confirming (or even referencing) the existence of the alleged joint venture and that he never informed anyone at VDSI of its existence. In any event, at trial, the testimony of Barrett's former co-workers who worked on developing the Inventions with Barrett will reveal

---

[1] The inventions at issue are called "MineTracer," "Gas Monitor" and "Gas Scrubber." Collectively all three of these inventions are referred to as the "Inventions."

PLAINTIFFS' TRIAL BRIEF
CASE NO. CV 13-03384 PSG (ADR)

the falsity of Barrett's tale. Their testimony will confirm that, far from completing the Inventions prior to his employment with VDSI and completely on his own, it was a team of skilled engineers and technical professionals, working over the course of years, who developed the technology at the heart of the Inventions. Furthermore, the testimony of the VCL executives with whom Barrett allegedly formed the oral joint venture will explain that no such agreement was made and that VCL has never before made any such deal with an employee of one of its wholly-owned subsidiaries.

At trial, Venture will prove that the Inventions were conceived of and developed by Barrett and his former co-workers in the course of their employment, utilizing Venture's resources and know-how. Consequently, Barrett assigned his rights to the Inventions to VDSI upon conception and has no further rights to them here. Venture accordingly seeks the following relief on its affirmative claims:

1) A declaratory judgment that Barrett has no ownership or other rights in or to the U.S. Patent No. 8,294,568;

2) A declaratory judgment that Barrett has no ownership or other rights in or to the U.S. Patent No. 8,858,688;

3) A declaratory judgment that Barrett has no ownership or other rights in or to the U.S. Patent Application Pub. No. US2013/0153060 A1;

4) A declaratory judgment that Barrett has no right to any profits derived from sales of products embodying the Inventions; and

5) An award of VCL and VDSI's reasonable attorneys' fees and related costs incurred in this action, as provided by the Inventions Agreement.

## II. FACTUAL BACKGROUND

### A. VENTURE PURCHASES THE RESEARCH AND DEVELOPMENT CENTER WHERE BARRETT WORKED, AND BARRETT ACCEPTS EMPLOYMENT WITH VDSI PURSUANT TO THE INVENTIONS AGREEMENT

VCL acquired a wireless systems networks unit of Agilent Technologies, Inc. in 2003. The unit included an R&D office in Liberty Lake, Washington. Barrett worked at the R&D office

and, like most of the other employees there, became a VDSI employee on November 1, 2003. As a condition of his employment with VDSI, Barrett signed the Inventions Agreement on June 28, 2003. As discussed in the next section, under the terms of the Inventions Agreement, Barrett broadly assigned any invention that he conceived of, developed or worked on in the course of his employment with VDSI.

**B. THE RELEVANT SECTIONS OF THE INVENTIONS AGREEMENT SHOW THAT BARRETT ASSIGNED ANY INVENTION THAT HE DEVELOPED DURING HIS EMPLOYMENT TO VDSI**

The Inventions Agreement contains several key provisions relating to the disclosure of inventions and the assignment of Barrett's rights to any inventions to VDSI. With regard to disclosure, Section 3.1 provides as follows:

> [Barrett] will disclose promptly to the proper officers or attorneys of the Company in writing any idea, invention, work of authorship (including, but not limited to, computer programs, software and documentation), formula, device, improvement, method, process or discovery, whether or not patentable or copyrightable (any of the foregoing items hereinafter referred to as an "Invention"), [he] may conceive, make, develop or work on, in whole or in part, solely or jointly with others during the term of [his] employment with the Company. The disclosure required by this Section applies: (a) during the term of my employment and for six months thereafter; (b) during my regular hours of employment and to my time away from work; (c) whether or not the Invention was made at the suggestion of the Company; (d) whether or not the Invention was reduced to drawings, written description, documentation, models or other tangible form; and (e) to any Invention which, in the opinion of the Company, is related to the company because it is related:
>
> > i. to the general line of business engaged in by the Company;
> >
> > ii. to any actual or anticipated business (including research and development) of the Company; or
> >
> > iii. to suggestions made by the Company or which resulted from any work assigned by or performed for the Company.

Section 3.2, which covers the assignment of rights to which Barrett agreed, provides as follows:

> [Barrett] hereby assign[s] to the Company without royalty or any other further consideration my entire right, title and interest in and to any Invention [Barrett is] required to disclose under Section 3.1; provided, that [Barrett] acknowledge[s] and agree[s] that the

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

> Company has hereby notified me that the assignment provided for in this Section 3.2 does not apply to any Invention which qualifies fully for exemption from assignment under the provisions of Section 2870 of the California Labor Code, a copy of which is attached hereto as Exhibit 3.2.

The exception outlined by Section 2870 provides, in pertinent part, as follows (emphasis added):

> (a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:
>
> (1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or
>
> (2) Result from any work performed by the employee for the employer.[2]

Cal. Lab. Code § 2870.

Taking the terms of the Invention Agreement and Section 2870 together, if Barrett "conceive[s,]" "develop[s]" or even just "work[s] on" any "Invention" during his employment at VDSI, he assigned that Invention to VDSI, unless he (1) does not use **any** of VDSI's equipment, supplies, facilities, resources or trade secrets, **and** (2) the Invention does not relate to VDSI's actual or reasonably anticipated business, **and** (3) the Invention does not result from any work performed by Barrett for VDSI.

Critically, if there was any invention that Barrett conceived of prior to his work date that he wished to be excluded from the Invention Agreement, he was obligated to "attach to Schedule 3.5B of this [Inventions] Agreement a brief description of all Inventions made or conceived by me prior to my employment with the Company which [Barrett] desire[s] to be excluded from this

---

[2] In other words, three separate scenarios exist under which an invention assignment agreement remains enforceable under section 2870: "(1) The invention was developed using the employer's time or resources; or (2) The invention relates to the employer's business or actual or demonstrably anticipated research or development; or (3) The invention resulted from work performed by the employee for the employer." *Cadence Design Sys., Inc. v. Bhandari*, Case No. C 07-00823 MHP, 2007 U.S. Dist. LEXIS 83078 at *18-19 (N.D. Cal. Nov. 8, 2007).

Agreement." Despite his stance in this litigation that he thought his Inventions were excluded from the agreement, Barrett did not identify *any* inventions in Schedule 3.5B and *never* attempted to update this contract.

### C. THE LIBERTY LAKE RESEARCH AND DEVELOPMENT TEAM, UNDER BARRETT'S SUPERVISION, CONCEIVE, DEVELOP AND COMMERCIALIZE THE INVENTIONS IN THE COURSE OF THEIR EMPLOYMENT AND USING VDSI RESOURCES

At the time of, and following, VCL's purchase of the Liberty Lake office from Agilent, the R&D team there was working to develop an Agilent wireless network optimization tool referred to as the Unattended Drive Test project ("Unattended"). The Liberty Lake team continued working on the Unattended project until Agilent terminated it in 2004. VDSI's Liberty Lake team thus cast about for new sources of work to keep its team together.

While searching for new work for the Liberty Lake office, Barrett learned, in March 2005, from a VDSI colleague with family links to the Chinese mining industry, that China was planning to invest billions in improving miner safety (following a series of mine tragedies). Barrett then conceived of a mechanism, incorporating VDSI's existing wireless monitoring capabilities, to track the location of workers in the various shafts and tunnels of a mine. Under Barrett's direction as manager, the Liberty Lake VDSI R&D team developed an invention and product, named "MineTracer." Subsequently, the Liberty Lake team, still under Barrett's supervision as manager, developed two related inventions, the "Gas Monitor" and "Gas Scrubber," which together created a product referred to as the Refuge Life Support system or "RLS."

The development of each of the Inventions was performed by Barrett and his fellow VDSI employees in the course of their ordinary employment, utilizing VDSI's resources, tools and instruments and was funded by VDSI.

### D. THE PRODUCTS EMBODYING THE INVENTIONS HAVE NOT GENERATED A PROFIT

To date, Venture has not realized any profit from sales of MineTracer or RLS, and there are no prospective sales that would recoup the massive investment made by Venture into developing and commercializing the Inventions. Even under Barrett's version of the facts, the "profits" to which he would be entitled under the alleged joint venture would only be recognized

-5-
PLAINTIFFS' TRIAL BRIEF
CASE NO. CV 13-03384 PSG (ADR)

"when the investment cost is paid off to zero." In other words, even under Barrett's alleged joint venture (which Venture contends never existed, Barrett would only be entitled to his share of "profit" *after* Venture had recouped the full amount it had invested in developing and commercializing the products. At trial, Venture will demonstrate that it has invested over $15 million in MineTracer and over $4 million in RLS and has not come close to recouping those investments. Moreover, Venture will show that it has no prospect of recovering the full amount of its investment in the future. The MineTracer and RLS products have been a financial failure for which Venture does not expect to ever make a profit.

## III. DISCUSSION

### A. CALIFORNIA LAW GOVERNS THIS DISPUTE

In ruling on the parties' cross motions for summary judgment, the Court held that "California law including [California Labor Code] Section 2870 applies to Barrett, the Inventions Agreement and all the claims and counterclaims at issue." D.I. 98 at 6 n. 20.

### B. BARRETT CANNOT OWN ANY OF THE INVENTIONS BECAUSE THE LIBERTY LAKE TEAM, UNDER HIS SUPERVISION, CREATED THEM AS EMPLOYEES OF VDSI

Pursuant to the terms of Barrett's Inventions Agreement, Barrett was obligated to disclose, among other things, any invention or idea he "worked on" during the course of his employment. The Inventions Agreement prospectively assigned to VDSI any invention for which disclosure was required. Barrett acknowledges that his "agreement with VDSI required disclosure of inventions, etc., that [he] might conceive, make, develop, or work on during the term of my employment with Venture." At trial, Venture will demonstrate that it was a team of workers at Liberty Lake who worked on and developed the Inventions. Indeed, contrary to Barrett's assertion that he had completely developed the technology prior to his employment, the testimony of Barrett's former colleagues will demonstrate that the Inventions were developed by Barrett and his fellow VDSI employees utilizing resources provided by VDSI. In other words, the Inventions were created by VDSI employees, including Barrett, within the ordinary course of their employment. Under the terms of the Inventions Agreement, therefore, the Inventions were assigned to VDSI.

## C. THE INVENTIONS ARE NOT WITHIN THE EXCEPTION CREATED BY LABOR CODE SECTION 2870

The only exception to the assignment provision in Section 3.2 of the Invention Agreement is the exception contained within California Labor Code Section 2870. That statute, however, does not apply to the Inventions for two reasons: (1) the Inventions were developed using VDSI's time and resources and (2) the Inventions are related to VDSI's business and anticipated research and development.

As already discussed, VDSI's time, VDSI's money and resources, and the time and expertise of other VDSI employees were devoted to developing the Inventions. Section 2870 provides that "if the invention *was* developed using the employer's time or resources, then the statute [Section 2870] does not prohibit assignment." *Cadence Design Sys., Inc.*, 2007 U.S. Dist. LEXIS 83078 at *17-19 n. 4 (N.D. Cal. Nov. 8, 2007) (original emphasis); *see also Iconix, Inc. v. Tokuda*, 457 F. Supp. 2d 969, 991-992 (N.D. Cal. 2006) (noting that "even if it was considered acceptable for Shen to use his Iconix computer for personal use, any Inventions developed using that computer had to be assigned and transferred."). Because the entire R&D team in Liberty Lake was involved in developing the Inventions as VDSI employees and using VDSI resources, Section 2870 does not preclude the Inventions' assignment per the Inventions Agreement.

Similarly, the evidence will show that the technology at the heart of the Inventions related directly to VDSI's then-existing business by incorporating VDSI's existing wireless monitoring capabilities. In fact, from the first time Barrett disclosed the Inventions to his supervisors, Barrett recognized that the Inventions were related to VDSI's business and any intellectual property resulting from developing the invention would be owned by Venture.

That the particular application (to mining safety technology) of VDSI's wireless networking and electronic communications expertise was not then part of Venture's catalog of products is not critical. Indeed, "[c]ourts interpreting employee assignment agreements in the context of section 2870 have construed the 'related to' phrase broadly." *Cadence Design Sys.*, 2007 U.S. Dist. LEXIS 83078 at *17 (citing *Cubic Corp v. Marty*, 185 Cal. App. 3d 438 (1986)). The *Cubic* case is particularly instructive. The employee in that case, much like Barrett here,

assigned to his employer any invention "coming within the scope of Company's business or related to Company's products or to any research, design, experimental or production work carried on by Company . . . ." 185 Cal. App. 3d at 444. Cubic was in the business of flight training software and the employee created an electronic combat simulator. *Id*. at 444-45. Notwithstanding that "Cubic did not produce a product with electronic warfare training capacities, that in particular the ACMR did not have electronic warfare training capacities and that Marty's invention did not necessarily have to be embodied in the ACMR system," the Court found that the product was "related to" Cubic's business under Section 2870. *Id*. at 447. Of particular importance here, the Cubic court found it persuasive that the defendant employee (*a la* Barrett) "presented the invention to Cubic as something to enhance Cubic's' products." *Id*. Because the Inventions are "related to" VDSI's business, Section 2870 does not apply.

### D. BARRETT'S ALLEGED "JOINT VENTURE" IS AN IMPERMISSIBLE MODIFICATION OF THE INVENTIONS AGREEMENT

Despite the plain language of his Inventions Agreement automatically assigning the Inventions to VDSI, Barrett contends that he entered into an oral joint venture with VCL, pursuant to which he would "deliver" the Inventions to VCL and, in return, VCL would fund the development processes, split the profits from sales of products embodying the inventions and purchase the Inventions from Barrett (at some later date). Notwithstanding the dearth of evidence that supports the existence of any such agreement, any alleged oral agreement would not impact that Inventions Agreement, which (as discussed above) served to transfer the rights in the inventions to VDSI.

The Inventions Agreement explicitly forbids any modification that is not in writing. Specifically, Section 5.7 of the Inventions Agreement provides that the terms can only be modified by a "writing signed by the party against whom enforcement of such modification is sought." California law, which governs this action, provides that a "contract in writing may be subsequently modified by an oral agreement only if (i) ***the written contract does not contain an express provision requiring that modification be in writing* . . . .**" *Marani v. Jackson*, 183 Cal. App. 3d 695, 704 (1986) (original emphasis). Accordingly, for the "joint venture" to have been

effective, Barrett and VDSI would have needed to enter into a new written agreement allowing Barrett to retain ownership of the Inventions that were otherwise assigned to VDSI. Because no written modification of the Inventions Agreement exists, the purported oral joint venture agreement did not and could not alter the terms of the Inventions Agreement. Accordingly, Barrett's "joint venture" claims fail as a matter of law.

### E. BECAUSE VENTURE ALWAYS OWNED THE INVENTIONS, BARRETT'S CLAIMS MUST FAIL

As the above analysis reveals, Barrett assigned the Inventions to VDSI through the Inventions Agreement. Barrett thus did not have any property rights in the Inventions that VCL could have converted or out of which he could have been defrauded. Likewise, without the Inventions to contribute to the joint venture (even if it was not an impermissible oral modification of the Inventions Agreement), Barrett's alleged joint venture (and breach of fiduciary duty claim based thereon) fails. Finally, because his employment was consideration for the contract that Venture has allegedly breached by failing to pay consideration, Barrett's breach of contract claim also fails.[3]

### F. BARRETT CANNOT PROVE DAMAGES WITH REASONABLE CERTAINTY

In order to succeed on his counterclaims, Barrett needs to be able to prove damages.[4] *See, e.g., Planet Goalie, Inc. v. Monkeysports, Inc.*, No. CV 11-07263 RZ, 2013 U.S. Dist. LEXIS

---

[3] Whether for lack of prior ownership of the goods in question or of harm suffered or of consideration for a deal, every cause of action alleged by Barrett fails when he never owned the Inventions in the first place. *See Martinez v. Welk Group, Inc.*, 907 F. Supp. 2d 1123, 1132 (S.D. Cal. 2012) ("under the Ninth Circuit, 'a breach of contract claim requires a showing of appreciable and actual damage.'"); *Graham-Sult v. Clainos*, 756 F.3d 724, 737 (9th Cir. 2014) (elements of conversion include "plaintiffs' ownership or right to possession of the property"); *Clear Channel Outdoor, Inc. v. Bently Holdings Cal. LP*, No. C-11-2573 EMC, 2011 U.S. Dist. LEXIS 140764 at *26 (N.D. Cal. Dec. 7, 2011) ("The elements of unjust enrichment are 'receipt of a benefit and unjust retention of the benefit at the expense of another.'"); *Vacchiano v. Wessell*, No. CV 12-2003 DSF (VBKx), 2014 U.S. Dist. LEXIS 39554 at *9 (C.D. Cal. Mar. 24, 2014) (and citations therein showing damages to be required for all manner of fraud claims); *Brewer v. Indymac Bank*, 609 F. Supp. 2d 1104, 1119 (E.D. Cal. 2009) ("The elements of a cause of action for breach of fiduciary duty are: 1) the existence of a fiduciary duty; 2) a breach of the fiduciary duty; and 3) resulting damage.").

[4] Barrett will also be unable to establish his claim for emotional distress and mental suffering as a result of Venture's alleged breach of contract. *See Erlich v. Menezes*, 21 Cal. 4th 543, 553-554 (Cal. 1999) ("Generally, outside the insurance context, 'a tortious breach of contract . . . may be found when (1) the breach is accompanied by a traditional common law tort, such as fraud or conversion; (2) the means used

57499 at *12-13 (C.D. Cal. Apr. 22, 2013) (granting summary judgment where "Plaintiff [] failed to provide in discovery any probative, competent evidence about lost profits, lost sales or reputational losses."). This requirement applies equally to each of Barrett's claims.[5] Under any of Barrett's theories, the damages sought are net profits, and it is all he is seeking.[6] But there have been no profits and it does not appear that there will ever be any profits. As a result, none of Barrett's claims can succeed.[7]

Under California law, a claim for lost profits fails when the claimant cannot demonstrate with reasonable certainty a monetary loss resulting from the other party's alleged bad acts. *Maggio, Inc. v. UFW*, 227 Cal. App. 3d 847, 870 (1991). Indeed, "it is fundamental that 'damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery.'" *Piscitelli v. Friedenberg*, 87 Cal. App. 4th 953, 989 (2001). As claims for lost profits typically arise from the context of failed business ventures, the case law generally analyzes them in such contexts. As laid out more fully below, two standards apply to the business lines at issue here, one for established businesses and one for new businesses. Thus, it is appropriate to analyze the two different products – the MineTracer system (which has a track record of sales, albeit sales that failed to generate a profit) and RLS (which, even today, cannot be

---

to breach the contract are tortious, involving deceit or undue coercion or; (3) one party intentionally breaches the contract intending or knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages.'").

[5] *See Martinez*, 907 F. Supp. 2d at 1132 ("under the Ninth Circuit, 'a breach of contract claim requires a showing of appreciable and actual damage.'") (and cases cited therein); *Graham-Sult*, 756 F.3d at 738 ("The elements of a cause of action for conversion [include] damages.'"); *Tyrone Pacific International, Inc. v. MV Eurychili*, 658 F.2d 664, 666 (9th Cir. 1981) (plaintiff's claim failed for inability to establish conversion damages which is based on the value of the converted property); *Clear Channel Outdoor, Inc.*, 2011 U.S. Dist. LEXIS 140764 at *26 ("The elements of unjust enrichment are 'receipt of a benefit and unjust retention of the benefit at the expense of another.'"); *Vacchiano*, 2014 U.S. Dist. LEXIS 39554 at *9 (and citations therein showing damages to be required for all manner of fraud claims); *Brewer*, 609 F. Supp. 2d at 1119 ("The elements of a cause of action for breach of fiduciary duty are: 1) the existence of a fiduciary duty; 2) a breach of the fiduciary duty; and 3) resulting damage.").

[6] Moreover, as discussed above, Barrett conceded that the "profits" to which he alleges he is entitled are only calculated after deducting all investments.

[7] Furthermore, both damage claims also fail because they are not supported by properly disclosed expert testimony – the testimony of Barrett's expert should be struck. *See* Motion *in Limine* No. 5, filed concurrently herewith.

sold due to a lack of regulatory approval) – as if they were two different businesses. Barrett cannot establish that damages are reasonably certain for either product under either standard.

### 1. BARRETT'S CLAIM FOR DAMAGES FOR THE MINETRACER PRODUCT MUST FAIL BECAUSE THAT PRODUCT NEVER GENERATED NET PROFITS

To prove lost profits where an established business "is prevented or interrupted" requires a showing with "reasonable certainty" of what the "prospective profits that otherwise might have been" derived from "the past volume of business and other provable data relevant to the probable future sales." *Parlour Enterprises, Inc. v. Kirin Group, Inc.*, 152 Cal. App. 4th 281, 287-288 (2007) (internal citations and quotations omitted); *accord Sargon Enterprises, Inc. v. University of Southern California*, 55 Cal. 4th 747, 781 (2012). Barrett cannot succeed on a claim of damages for any profits purportedly produced by the MineTracer product, not even under the more lenient standard of the "established" business. The lack of profits generated from the past volume of business is dispositive here because there is no data showing ***probable*** future sales sufficient to generate a profit.

The evidence at trial will demonstrate that, although the MineTracer product has been sold, it has not generated any profit to date. Thus, to the extent that there is a track record with this product, it is a track record of failure and of money spent but not recovered. Indeed, the MineTracer was so unprofitable that VDSI's corporate affiliates had to loan VDSI money so that VDSI could continue trying to develop the product. Nor is there any evidence whatsoever that VCL or VDSI had any reason not to put forward their best efforts to sell this product while Barrett was there. Thus, there is neither a causal nexus for damages nor any economic harm to be had in regard to the MineTracer product.

Extrapolating future profits from that track record requires not only pure speculation, it requires an intentional disregard for the actual facts of the business. Barrett has not and cannot present evidence to show that the product would succeed. This lack of a track record of producing profits makes the likelihood of profits from the MineTracer business line even more speculative than profits from an unestablished business. *See Greenwich S.F., LLC v. Wong*, 190 Cal. App. 4th 739, 766 (2010) (finding the plaintiff's claim for lost profits to be too speculative

because the plaintiff assumed, rather than actually proved, the reasonable certainty of future events upon which the damages claim depended); *Food Safety Net Services v. Eco Safe Systems USA, Inc.*, 209 Cal. App. 4th 1118, 1132 (2012) (affirming grant of summary judgment on failure to present evidence of damage because "lost profits based on a future contract cannot be recovered when the contract is uncertain or speculative"); *Kids' Universe v. In2Labs*, 95 Cal. App. 4th 870, 887 (2002) (Finding no triable issue as to lost profits where, among other things, the lost profits were speculative because the toy store had never before operated its website "as a profit-producing venture," and the online toy market "was not an established one."); *accord Brother Records v. Jardine*, 318 F.3d 900, 910 (9th Cir. 2003) (affirming summary judgment where, as a matter of law, prospective profits could not be shown with reasonable certainty ).

**2. BARRETT'S CLAIM FOR DAMAGES FOR THE RLS PRODUCT MUST FAIL BECAUSE THE RLS PRODUCT HAS NEVER BEEN SOLD, LET ALONE GENERATED PROFITS**

To date, the RLS has not been commercially sold (other than *de minimis* sales of prototypes). In this respect, RLS is essentially a new, un-established business. Indeed, there are no net profits here to share, and even if Barrett had a viable claim to them – which he does not – Barrett can offer no evidence to show, with reasonable certainty, that the RLS will ever generate a profit.

It is far more difficult to show a reasonable certainty of profits with a business that is new or not yet established. Indeed, such damages "are generally not recoverable because their occurrence is uncertain, contingent and speculative." *Parlour Enterprises, Inc.*, 152 Cal. App. 4th at 287-288. The loss of profits from a new business "may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like." *Id*. at 288. An expert must rely on evidence of profits generated in circumstances that share "a substantial similarity between the facts forming the basis of the profit projections and the business opportunity that was destroyed." *Id*. at 288. The expert must further "support [his opinions with] tangible evidence with a 'substantial and sufficient factual basis' rather than by mere 'speculation and hypothetical situations.'" *Id*. at 288.

Thus, Barrett must prove that there would have been sales of RLS. Without that proof, his claim fails: "[T]here can be no recovery of damages if the fact that a monetary loss was sustained is left in doubt." *Patton v. Royal Industries, Inc.*, 263 Cal. App. 2d 760, 768 (1968) ("There was no way in which the plaintiffs could prove the business they launched for themselves would have been a success if the defendants had not interfered with it. The right to recover damages cannot be left to speculation, and the prospect [of] success in their new venture was purely speculative and wholly without a factual basis.").

Here, no such proof exists. On the contrary, with respect to the RLS, Barrett has shown only possible plans to make sales – not even sale contracts. Mere plans – even when there is a contract in place (and there is not here) – are insufficient to support a claim for lost profits. *See Greenwich S.F., LLC*, 190 Cal. App. 4th at 763 ("The existence of plans for a development does not supply substantial evidence that the development is reasonably certain to be built, much less that it is reasonably certain to produce profits."). There is no certainty that any profits would have been generated at all. *See Maggio*, 227 Cal. App. 3d at 870 ("Damages for loss of profits may be denied to an 'unestablished' or new business as being too uncertain and speculative if they cannot be calculated with reasonable certainty."). Indeed, the Ninth Circuit has gone so far as to contemplate whether there is a *per se* rule in California against awarding damages based on agreements to agree or letters of understanding. *Vestar Dev. II, LLC v. Gen. Dynamics Corp.*, 249 F.3d 958, 962 (9th Cir. 2001) (not reaching the issue because the Ninth Circuit found that there could be no reasonable certainty as to future profits from the pending deal in that case) (*citing Auerbach v. Great Western Bank*, 74 Cal. App. 4th, 1172, 1191-92 (1999) ("Without some basis for calculating the actual financial benefit [from an agreement to agree], the damages awarded by the jury . . . are the result of pure speculation and cannot be sustained."). Thus, Barrett's claims must fail for lack of reasonably certain damages.

SQUIRE PATTON BOGGS (US) LLP
600 Hansen Way
Palo Alto, California 94304

## IV. CONCLUSION

Venture submits this Trial Brief to assist the Court with the evidence presented at trial, and can supplement any of the above information should the Court desire additional briefing on any particular issue.

Dated: April 23, 2015

SQUIRE PATTON BOGGS (US) LLP

By: /s/ *David S. Elkins*
    David S. Elkins
    Joseph P. Grasser
    Rafael M. Langer-Osuna

Attorneys for Plaintiffs and
Counterclaim Defendants
VENTURE CORPORATION LTD and
VENTURE DESIGN SERVICES, INC.