Mary Schultz (State Bar No. 231962)
MSchultz@MSchultz.com
MARY SCHULTZ LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA  99031
Tel:     (509) 245-3522
Fax:     (509) 245-3308

**Attorney for Defendant/Counterclaimant**
James Barrett

## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **VENTURE CORPORATION LTD and VENTURE DESIGN SERVICES, INC.,**<br><br>      Plaintiffs,<br><br>v.<br><br>**JAMES P. BARRETT,**<br><br>      **Defendant.** | **Case No.  CV-13-03384-PSG (ADR)**<br><br>**DEFENDANT/ COUNTERCLAIMANT'S TRIAL BRIEF**<br><br>Trial Date:      May 26 2015<br>Time:             9:30 a.m.<br><br>Pretrial Conf.:  May 5, 2015<br>Time:             1:30 p.m. |
| **And Related Counterclaim.** | Courtroom 5 – 4th Floor<br>The Hon. Paul Singh Grewal |



# TABLE OF CONTENTS

<u>Page</u>

TABLE OF CONTENTS ................................................................... i-ii

TABLE OF CONTENTS ................................................................... iii-v

A.    Background and Summary ................................................... 2

B.    Evidence to be presented ................................................... 3

C.    The ownership contracts ................................................... 4

D.    The primary deception ................................................... 10

E.    The termination ................................................... 13

AFFIRMATIVE DEFENSES ................................................... 16

COUNTERCLAIMS ................................................... 17

      A.    Joint venture and repudiation/breach of fiduciary relationship ................................................... 17

      B.    Breach of contract ................................................... 17

      C.    Breach of implied covenants ................................................... 17

      D.    Fraud ................................................... 17

ARGUMENT ................................................... 17

           1.    A joint venture was formed ................................................... 17

           2.    Breach of a Fiduciary Duty ................................................... 20

           3.    Breach of Contract ................................................... 21

           4.    Breach of implied covenant of good faith and fair dealing ................................................... 23

DEFENDANT/COUNTERCLAIMANT'S TRIAL BRIEF – Page i
CASE NO. CV 13-03384-PSG (ADR)



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

5.    Fraud/Concealment/Deception/
      Intentional Misrepresentation ............................................. 23

6.    Witnesses to be called ....................................................... 24

7.    Damages ............................................................................. 24

8.    Punitive Damages ............................................................... 25

9.    Attorney Fees ...................................................................... 26

10.   Miscellaneous ..................................................................... 26

CERTIFICATE OF SERVICE ................................................................ 28



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

1

## <u>TABLE OF AUTHORITIES</u>

2

3

<u>CASES:</u>

4

*Alfaro v. Community Housing Improvement System*
   *and Planning Ass'n, Inc.*,
   171 Cal. App. 4th 1356 (2009) ......................................................24

*Andrews v. Bush*,
   109 Cal.App. 511 (4th Dist. 1930)...............................................19

*Blackburn v. Allen*,
   218 Cal. App. 2d 30, 32 Cal.Rptr. 211 (1963)..............................22

*Cleveland v. Johnson*,
   209 Cal.App.4th 1315 (2012)........................................................20

*Curry v. Charles Warner Co*,
   42 A. 425, 2 Marv., Del.98 (1895)................................................22

*In re Estate of Young*,
   160 Cal.App.4th 62, 72 Cal.Rptr.3d 520 (2008)...........................23

*Foster v. Keating*,
   120 Cal.App.2d 435, 261 P.2d 529 (1953) .......................18, 20, 21

*Fragate v. Faulkner*,
   110 Cal.App.4th, 229 (2003).........................................................25

*Geolograph Co. v. Cities Service Oil Co.*,
   251 F.2d 261, 116 U.S.P.Q. 114 (C.A.10, Okla. 1958) ................23

*In re Yan*,
   381 B.R. 747 (N.D. Cal. 2007) ...............................................18, 19

*Ittella Foods, Inc. v Zurich Ins. Co.*,
   98 F. App'x 689,690 (9th Cir. 2004) ............................................25

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28


MARY SCHULTZ LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

*Mead Corp. v. U. S.*,
  490 F.Supp. 405, 208 U.S.P.Q. 205,
  *Aff'd* 652 F.2d 1050, 209 U.S. App. D.C. 253,
  211 U.S.P.Q. 491 (D.C.D.C. 1980).................................21

*Nelson v. Abraham*,
  29 Cal.2d 745, 177 P.2d 931 (1947) ..............................19

*Pacific Atlantic Wine, Inc. v. Duccini*,
  111 Cal.App.2d 957, 245 P.2d 622 (1952) ........................19

*Rude v. Westcott, Ind.*,
  9 S.Ct. 463, 130 U.S. 152, 32 L.Ed. 888 (1889)................22

*Salahutdin v. Valley of Cal., Inc.*,
  24 Cal.App.4th 555 (1994)........................................25

*Scottsdale Ins. Co. v. Essex Ins. Co.*,
  98 Cal.App.4th 86, 119 Cal.Rptr.2d 62 (2002)...............18, 19

*Sole Energy Co. v. Petrominerals Corp.*,
  128 Cal.App.4th 212, 26 Cal. Rptr.3d 798 (2005) .............26

*Unruh-Haxton v. Regents of Univ. of Cal.*,
  162 Cal.App.4th 343 (2008).......................................18

*Vess v. Ciba-Geigy Corp. USA*,
  317 F.3d 1097 (9th Cir. 2003)....................................23

*Von Grabe v. Sprint PCS*,
  312 F. Supp.2d 1285 (S.D. Cal. 2003)............................ 26

*Weiner v. Fleischman*,
  54 Cal.3d 476 (1991) ............................................18

*Wilson v. Marlow*,
  66 Ill. 385 (1872) ..............................................22

*Wolf v. Superior Court*,
  107 Cal.App.4th 25, 29 (2003), ..................................20

DEFENDANT/COUNTERCLAIMANT'S TRIAL BRIEF – Page iv
CASE NO. CV 13-03384-PSG (ADR)



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

*Wolf v. Superior Court,*
   114 Cal.App.4th 1343 (2004)................................................................21

## RULES:

Cal. Civ. Code § 1654 ........................................................................22

Cal. Civ. Code § 1717 ........................................................................26

Cal. Civ. Code § 3294 ........................................................................25

Cal. Civ. Code § 3333 ........................................................................25

## SECONDARY AUTHORITIES:

CACI 200 ............................................................................................21

CACI 314 ............................................................................................23

CACI 315 ............................................................................................23

CACI 317 ............................................................................................23

CACI 318 ............................................................................................23

CACI 319 ............................................................................................23

CACI 320 ............................................................................................23

CACI 325 ............................................................................................23

CACI 353 ............................................................................................25

CACI VF-1900......................................................................................24

CACI VF-1901......................................................................................24

CACI VF-1902......................................................................................24



MARY SCHULTZ LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

1

CACI 1908 .................................................................................... 24

CACI 1924 .................................................................................... 24

CACI 3945 .................................................................................... 25

CACI VF-3900 .............................................................................. 25



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

Defendant/Counterclaimant James Barrett ("Barrett") submits the following trial brief.

## A.   <u>Background and Summary</u>

This action was initiated by the Plaintiffs, Venture Corporation Ltd. and Venture Design Services (the Ventures), against Washington citizen James P. Barrett, a former employee of Venture Design Services, employed exclusively in, and working in, Spokane County, Washington.

James Barrett is the inventor of now patented MineTracer technologies—an invention suite which includes wireless mine tracking, monitoring, and a rescue system. Barrett invented and reduced these inventions to practice prior to his employment with Venture Design Services in and around mid-2003. The inventions were presented to VCL in March 2005 as a business proposal for a partnership, and VCL and Barrett developed and marketed the inventions over the ensuing years. Barrett assigned his rights in his inventions to VCL in 2008 and 2011 for consideration. VCL then severed all ties with Barrett in March 2013, and now claims it owns Barrett's inventions under a 2003 VDSI Employee Invention Agreement with Barrett. Barrett agrees that VCL owns his inventions—but under the formal contracts for consideration that he signed at VCL's request in 2008 and 2011. Barrett alleges that, as a matter of *law*, these later contracts specific to the inventions necessarily control the parties' assignment transaction. These are the assignment contracts recorded with the USPTO as evidence of the assignment types and dates.

A phrase within those contracts must be interpreted by the court—the contract phrase



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

"for good and valuable consideration acknowledged to have been received in full by Assignor." That phrase must be construed against its drafter, VCL. This is particularly so here, because VCL and their counsel specifically excised any reference to the 2003 Invention Agreement in the assignment contracts to deceive not just Barrett, but Agilent. There *could* have been three owners of these inventions. VCL came out on top by subterfuge. Barrett is entitled to damages.

**B.   Evidence to be presented:**

Plaintiff Venture Corporation Ltd. (VCL) is a Singapore corporation, which has gained substantial wealth by "partnering" with inventors to help develop and commercialize their inventions for market. VCL thus receives access to early stage intellectual property, using its subsidiary "contract design" entities such as Venture Design Services (VDSI) to commercialize its customers' inventions. Such access to others' early stage intellectual property necessitates any inventor's high degree of trust in VCL. VCL advertises its services as a "turnkey" approach "from concept to design, to manufacturing, testing and support—we handle it all." Venture refers to such a role as a "mutually beneficial partnership."[1]

Agilent is an inventing company with some component in Singapore known as

---

[1]   *Certain contracts evidencing such arrangements and relevant here were just produced by VCL/VDSI/Stainbrook on April 15, 2015 but only as "HIGHLY CONFIDENTIAL –ATTORNEY'S EYES ONLY." Such contracts cannot be applied without sharing them with Defendant Barrett given projects and content, but appear to comport with the facts herein.*



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

"Agilent Technologies Singapore Pte. Ltd."

## C.       The ownership contracts.

In May 2003, James Barrett was an engineer working for Agilent in Washington as Agilent's project manager on its "UA" project—the UNATTENDED DRIVE TEST project, among other projects.

On May 1, 2003, Agilent entered into a Research and Development Contract with VCL.[2]  VCL would develop Agilent's "UA" project.  The contract controlled who would own what arising from VCL's development of Agilent's UA project.[3]

On May 23, 2003, VCL and VDSI entered into their own intercompany Research and Development Contract.  Ownership of IP in VDSI would automatically transfer to VCL. *(May 23, 2003 VDSI-to-VCL 2003 R&D Agreement).*

On June 28, 2003, James Barrett, Agilent's project manager on its "UA" project, signed a VDSI "Employee Invention Agreement."[4]  Under the 2003 VDSI Invention

---

[2]  *Research and Development Services Agreement, effective May 1, 2003, [produced April 15, 2015 but only as "HIGHLY CONFIDENTIAL –ATTORNEY'S EYES ONLY."— contracts have not been extensively reviewed, but appear to cover* UNATTENDED DRIVE TEST*].*  That agreement references a 2003 "Global Manufacturing Services Agreement" which has not been produced to date.

[3]  Work Product, Inventions, Works of Authorship, Trademarks, Preexisting Intellectual property and "Venture Developed Intellectual Property."

[4]  In June 2003, Mr. Barrett was told by Aglient that his Agilent employment would be terminated. On Nov. 1, 2003 he would start with VDSI as his new employer. VDSI was now going to develop Agilent's UA drive test project or Agilent. Mr. Barrett would remain the project manager, but he would now be working as VDSI's project manager on the same Agilent UA project.



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

Agreement, whatever Barrett "may conceive, make, develop or work on, in whole or in part, solely or jointly with others during the term of (his) employment" was automatically assigned to VDSI. This included anything that "in the opinion of the Company" related to VDSI's actual or anticipated business (including research and development). The only exceptions to this automatic assignment existed where the invention was developed entirely on the employee's own time, without "using VDSI's equipment, supplies or trade secret information." Even then, if the invention related at the time of conception or reduction to practice of the invention to VDSI's business or "actual or VDSI's demonstrably anticipated (R & D)" or resulted "from any work performed by Barrett for VDSI," it was automatically owned by assignment to VDSI.

On August 1, 2003, VCL and Agilent entered into a Research and Development Agreement for Agilent's NITRO product line. NITRO used similar IP to the UA project managed by Barrett.[5]

As of November 2003, the only projects on which VDSI were now working were Agilent's. VDSI had no intellectual property or software of its own—its sole purpose was to contract design for Agilent's projects. In sum, as of November 2003, if Barrett *did* conceive of any invention during the term of his VDSI employment that was not specifically excluded, *see Invention Agreement 3.1,* then VDSI had ownership of the invention. By VDSI's ownership, the ownership would automatically transfer to/vest in

---

[5]    *[Produced April 15, 2015 but only as "HIGHLY CONFIDENTIAL –ATTORNEY'S EYES ONLY."—contracts have not been extensively reviewed, but appear to cover siblings* UNATTENDED DRIVE TEST *and* NITRO*].*



MARY SCHULTZ LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

VCL. And by VCL's ownership, VCL would be required to disclose that invention to Agilent, because Barrett had conceived of his invention while working as the project manager on Agilent's UA project.

To qualify for "Venture Developed Intellectual Property" and exclude this newly owned IP from delivery to Agilent, VCL would have had to show Agilent that the newly owned IP was developed "without any use of Agilent's intellectual property rights," and was not "derivative in any way of Agilent's IP." *Agilent 2003 Contract* at para. 8. But any conception of an invention on the job by VDSI's Agilent Project Manager would create immediate questions concerning VDSI's direct, indirect or derivative use or re-use of Agilent's intellectual property. At the least, Barrett's participation, along with his interrogation as to when and how he conceived of the invention, would *necessarily* be required to sort out who owned Barrett's inventions between VCL and Agilent.

From July to September 2003, before he started work with VDSI, Mr. Barrett continued his employment with Agilent as a UA project manager. On his own time, in his home, he invented and reduced to practice the "MineTracer Tracker."[6] He did nothing with his invention at that time, other than use parts of it for his home entertainment system. In November 2003, Barrett transitioned to oversee and manage the Agilent

---

[6]  Wireless Mine Tracking, Monitoring, and Rescue Communication System, consisting of the MineTracer, the Toxic Gas Removal and Air Conditioning System for human life support and enclosed refuge spaces (Gas Scrubber), and the Gas Monitoring System with oxygen control for human life support in enclosed refuge spaces (Gas Monitor).

MARY
SCHULTZ
LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

projects, now as a VDSI project manager.

In late 2004, Agilent canceled its UA project with VCL, but components of that Agilent IP still resided in VDSI and its employee teams.  The May and August 2003 Agilent/VCL Agreements necessarily continued in force, as no notice of termination of either contact has been disclosed by VCL.

In March 2005, James Barrett solicited VCL executives directly for interest in his MineTracer invention. Barrett wanted to target the Chinese mining industry.  He felt that his inventions would be worth millions, and openly expressed that view to VCL executives.  Barrett went into detail about the invention and what it would do.  In response, VCL's E.H. Soo asked Barrett for time to explore the proposal, did so, and stated to Barrett in writing: "I hope we're not too late."  VCL/VDSI made no inquiry of Barrett as to the origin of his invention, or whether it had arisen from his work at VDSI on the Agilent project.  They did not ask when and how this invention was conceived. Instead, VCL apparently determined that the invention could indeed be worth "millions," and decided they wanted it.

Because Barrett was an inventor, but was also a VDSI project manager on the Agilent UA project, then if VCL intended to take Barrett's inventions for themselves, VCL had two options: 1) Assert the 2003 VDSI Employee Invention Agreement against Barrett right now and tell him that VDSI and VCL owned his inventions as inventions conceived during his term of employment, which would mean that Agilent likely owned the inventions; or, 2) Treat Barrett and his invention as an independent inventor, and let



MARY
SCHULTZ
LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

him think he was a partner in developing his inventions for commercialization, just like VCL would do with any other inventor. The latter route would necessitate specifically *not* taking the inventions from Barrett under the 2003 VDSI Invention Agreement, because that would place these inventions with Agilent. The issue arising by this "independent inventor/joint project" approach, however, would, of course, be what to do with Barrett once Barrett had developed and patented the technologies, and poised them for sale on the international market. The decision was likely made by VCL at that time that dealing with Barrett when the time came would be a lot easier than dealing with Agilent. And so that is what happened.

From March 2005 through December 2013—a period of eight *years*, VCL treated Barrett as a "startup" owner—an entrepreneur, a partner. It never asked him where his invention originated from. It never told him that his inventions were VDSI property. It never mentioned, referred to, raised, or asserted the 2003 Invention Agreement. Instead, Barrett and VCL together developed Barrett's independent technology. VCL funded the operation and provided its "turnkey approach" to mass production and commercializing of this MineTracer product for its inventor—James Barrett. Barrett remained a VDSI project manager at his same salary, but the "inventing customer" whose project was being developed for commercialization was now James Barrett.

Venture provided Barrett with lawyer Craig Stainbrook to assist Barrett in getting Barrett's inventions patented in his own name. From 2006 on, attorney Stainbrook assisted Barrett in applying for and obtaining patents in Barrett's own name, and assured



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

Barrett that he would be protecting Barrett's sole ownership interest in the patents.  Barrett saw this promise in practice—through all applications created by Stainbrook, Stainbrook was protecting Barrett's ownership as a sole inventor.  Barrett even gave Stainbrook Powers of Attorney to act for Barrett.

Commercially, Barrett used VDSI as the name entity to draw interest to his products, he solicited and sought out customers and markets for his products, created and "starred in" advertising and trademarks, and began making sales of his MineTracer.  All patents would issue in the name of James Barrett as the inventor.

Throughout the years, Barrett would communicate as a partner directly with VCL executives in Singapore, including VCL co-founders, including N.L. Wong, the CEO Board Chairman and co-founder of VCL.  Barrett would travel to Singapore (and/or hold teleconferences) each and every month to report to VCL executives on the workings of the "business," the business would be referred to by VCL executives as "Jim's business," and the parties at all times operated as business partners, with VCL funding and Barrett developing this new entrepreneurial endeavor.

In late 2006, Agilent and VCL entered into a Dec. 19, 2006 Delivery and Supply contract continuing the protections for Agilent's "DRIVE TEST software product line."[7] None of the then-underway MineTracer technology or development was disclosed to Agilent.  No deception was involved, only because the MineTracer IP *was* James

---

[7]   *[Produced April 15, 2015 but only as "HIGHLY CONFIDENTIAL –ATTORNEY'S EYES ONLY."—contracts have not been extensively reviewed, but appear to cover "UA" DRIVE TEST].*



MARY SCHULTZ LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

Barrett's, and remained solely in his name.

In November 2007 and early January 2008, Agilent and VCL executed an amended agreement that amended the project statement of the December 2006 Agilent/VCL R&D agreement.[8]  This amendment referenced a product that was required to have the capability to "Combine with Agilent's wireless optimization platform for DRIVE TEST…"  Agilent was thus continuing its claim for rights to "Agilent's wireless optimization platform"—a project that went back to at least the year 2000 when an "ARMS" project was being done at Agilent under Barrett's leadership.  Any re-use or derivative use of any intellectual property on that project from any of the years 2000-2008 would necessarily have been Agilent's (ARMS, UA, ACCESSRF, NITRO, etc.), and would be subject to the Agilent rights claims in the Agilent/Venture contracts. The final "release" of a portion of this project was to be on Dec 7th 2008.  Again—since MineTracer was Barrett's, no obligation to disclose arose.

## D.  The primary deception.

From August 2008 through Dec. 2008, the Ventures now began working with Attorney Stainbrook to get Barrett to assign his MineTracer IP to them.  There were two problems to address.   1) Any assignment under the 2003 VDSI Invention Agreement would require disclosure of owned IP to Agilent, and explaining why the MineTracer hadn't been disclosed *before*; and 2) Barrett thought he was a partner and could refuse any

---

[8]   *[Produced April 15, 2015 but only as "HIGHLY CONFIDENTIAL –ATTORNEY'S EYES ONLY."—contracts have not been extensively reviewed, but appear to cover UNATTENDED DRIVE TEST].*

MARY SCHULTZ LAW. P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

assignment that suggested that VDSI owned his MineTracer rights under that 2003 Invention Agreement "from the outset." The solution was simple—an acquisition for consideration would be done between Barrett and VCL. The Ventures told Barrett that they needed MineTracer assigned so VCL could obtain "Pioneer tax status" in Singapore and maximize profits. This was deceptive.

Unbeknownst to Barrett, Attorney Stainbrook had been presenting drafts to VCL/VDSI of a Barrett assignment to VDSI, using the 2003 VDSI Invention Agreement as the specific identified consideration for the transfer. Stainbrook's drafts had Barrett assigning his MineTracer IP to VDSI *specifically* under the 2003 Invention Agreement. Then, another draft assignment created would have VDSI transferring *its* rights to VCL on a corporate-to-corporate assignment, under the Ventures' own mutual 2003 VDSI/VCL R&D agreement. Stainbrook told the Ventures directly that if these assignment agreements existed, it needed to be done the way proposed in the drafts. Barrett never saw those drafts. But VCL corporate legal counsel did. And VCL corporate counsel directed Stainbrook to redo the assignments. Stainbrook was directed to: 1) make the transfer from Barrett to VCL, with no mention of VDSI; 2) *excise* any reference to the 2003 VDSI Employee Invention Agreement; 3) make the assignment to VCL "for good and valuable consideration," and 4) use terms like "herein acquires," and 5) make the acquisition date effective January 1, 2008. The latter date would affirmatively *disprove* any automatic transfer of Barrett's MineTracer under the 2003 Invention agreement (Barrett's disclosure to VDSI was in 2005). VCL thus avoided any obligation to disclose to Agilent; it had *just*



acquired MineTracer from an independent inventor—Barrett—*for consideration.*

This 2008 assignment was not a "standardized" assignment; to the contrary, the discussion about this went on over a period of *months* between VCL, VDSI and Stainbrook before it resulted in the final assignment for Barrett's consideration.

On Dec. 5, 2008, the Ventures sent Barrett the final assignment of his MineTracer IP "for good and valuable consideration." All reference to the 2003 VDSI Invention Agreement had been excised.  Barrett's assignment was to be direct to VCL for consideration.  The assignment was specifically to be made effective Jan, 1, 2008.  Barrett signed the contract.  Craig Stainbrook recorded it with the USPTO.  This assignment is recorded in the USPTO as *the* definitive basis for this transfer of rights as a matter of law. This assignment shows a purchase from Barrett for consideration, not any "absorbed" IP. Nowhere does it reference any "2003 Employee Invention Agreement" transfer—by *direct design.* As far as Barrett knows, there was no challenge from Agilent.

And as for VCL, by the use of the generic phrase "for good and valuable consideration," VCL left open its intent to claim that the phrase meant anything VCL wanted it to mean.  VCL's intent at the time was to claim, much later on, that this vague phrase *actually* meant "in consideration for the 2003 Invention Agreement"—the very language they had just specifically excised.  Barrett had no idea. For him, "good and valuable consideration" was the partnership already long underway since March 2005.

In April 2010, Agilent wrote to VCL asking to assign its rights in its prior contracts with VCL to JDS Uniphase as a successor in interest to the 2006 VCL/Agilent



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

Development and Supply agreement, and its November 2007 amendment.[9]  On May 4, 2010, VCL consented to the assignment.[10]  This assignment now gave JDSU rights to the same Agilent DRIVE TEST IP.  This contract was to extend until May 1, 2012, and would then renew automatically for one year periods unless written notice was given by one party to the other. Barrett has not received any notice of cancellation with these late disclosed contracts.  These contracts with JDS Uniphase remain in force.

On July 26, 2011, VCL thus asked Barrett to give it a second assignment of Barrett's Gas Scrubber invention.  The same form of deceptive contract was used—no transfer to VDSI, no mention of VDSI, no mention of any 2003 VDSI Employee Invention Agreement, and an acquisition for good and valuable consideration.  Barrett again signed it.  The "good and valuable consideration" he was acknowledging continued to be that of the joint venture/partnership in effect since March 2005.

In December 2012, Stainbrook now forwarded a third proposed assignment for the final component of MineTracer—the Gas Monitor component, with patent pending.  Mr. Barrett declined to sign this assignment.  He was growing uneasy.  For good reason.  The end was near.

**E. The Termination**

By March 2013, all of Barrett's MineTracer technologies were developed, the

---

[9]   Disclosed as "confidential" in March 6, 2015 Stainbrook deposition production.

[10]   [Not disclosed until April 15, 2015, and disclosed as "HIGHLY CONFIDENTIAL-ATTORNEY'S EYES ONLY].

MARY
SCHULTZ
LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

patent applications submitted, one patent already received for MineTracer, the second two patent applications pending, and the last two products (the "Refuge Life Support" components) on the verge of full certification and robust sales into a Congressionally mandated market. VCL now decided to excise Barrett *himself* from the equation.

VCL executives told Barrett that it would cut the funding to his MineTracer project—right before expected certification and worldwide distribution into the market. The project, said VCL, was "not profitable." Barrett pleaded his case. He wrote to VCL executives, explaining how his system was poised for certification, with a mandated USA market and now an international market, and with uses of the technology far beyond just the mining industry. By now, there was interest within the medical industry, by NASA, and even for chemical warfare defense. Countries across the globe were expressing interest, particularly in the Gas Monitor and Scrubber technologies. China's government had by then patterned a nationwide mandate for adoption that copied the United States' Congress' Miner Act mandate.

VCL set up a Singapore/Spokane Board teleconference meeting call as a "status conference" with Barrett for March 20, 2013 at 3:00 p.m. PST. VCL executives requested that Barrett deliver evidence of the "millions of dollars" that had been and were being discussed to show the project's merit. Barrett did so. On less than a week's notice, Barrett obtained and emailed to VCL executives numerous mining partner industry commitments from his customer base. Expert Scott Hampton has valued the commitments that Barrett produced for the March 20, 2013 conference call meeting as



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

generating up to $357 million of revenue and up to $102 million of net pretax profit to both parties. Barrett emailed these commitments to VCL executives from March 14th-March 20, 2013 in preparation for the March 20 call.

On the date and time agreed for the March 20, 2013 Singapore-to-Spokane teleconference, VCL's C.T. Wong walked into Barrett's Liberty Lake office and fired Barrett. Wong told Barrett that if he signed a contract releasing all of his IP rights to VCL, the Ventures would give him $25,000. If he did *not* sign, he would receive nothing. Barrett declined to sign.

Following his termination, Barrett hired counsel and wrote to VCL. Referencing his 2008, 2011, and the unsigned 2012 assignment contracts that had been recorded with the USPTO and prepared by VCL, Barrett asked VCL exactly what it meant by "good and valuable consideration acknowledged by (Barrett) to have been received in full." The Ventures responded by filing a lawsuit against Barrett in the Northern District of California, explaining that what they meant was that they *always* owned Mr. Barrett's MineTracer under Barrett's 2003 VDSI Invention Agreement. They demanded enforcement of the "2003 Employee Invention Agreement," now asking for all of their fees and costs for now having to explain this to Barrett. Both Ventures, now along with attorney Craig Stainbrook, have all aligned to now claim that Barrett "knew" that the consideration stated in Barrett's assignment contracts was the very language VCL had explicitly excised—that being the "2003 VDSI Invention Agreement."

In October 2014, Barrett's Toxic Gas Scrubber patent issued from the United States



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

Patent Office naming James Barrett as the inventor.   Neither of the Ventures, or his continuing attorney-in-fact Stainbrook, told Barrett or forwarded him a copy.   Barrett found out from an online advertising offer to send him a "plaque" for his achievement.   Barrett's Gas Monitor patent is the only patent that has not yet issued.   In March 2015, it would be discovered via the deposition of attorney Stainbrook that Stainbrook had been using Barrett's Powers of Attorney to maintain all of Barrett's patents for VCL, and to meet with the USPTO.   As Barrett had never formally assigned his Gas Monitor to VCL, Attorney-in-fact Craig Stainbrook himself assigned it to his other client, VCL.

Mr. Barrett is now a defendant. His position is that VCL can have the patents, the trademarks, and the works of authorship the Ventures took from him and have since destroyed, while selling licensing rights to the systems.   But this is not because of any 2003 Invention Agreement.   Barrett asserts the parol evidence rule, estoppel, waiver, laches, and voidness as to the 2003 Invention Agreement.   He asserts that he is entitled to the pre-trial exclusion of any such theory or evidence being presented by VCL. *(See Motions in Limine).*   He asserts that even if the 2003 Agreement is improperly allowed into evidence, he is entitled to directed verdicts on estoppel, waiver, and laches.

## AFFIRMATIVE DEFENSES

Barrett asserts affirmative defenses including the parol evidence rule (actually an evidence rule, but listed here) waiver, estoppel, forfeiture, and laches. He previously asserted a void 2003 Invention Agreement, and such is still at issue as a matter of law. These defenses are briefed in his motion in limine, and, if not granted, will be raised again as a request for a



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

directed verdict at the close of evidence.

## COUNTERCLAIMS.

Barrett has filed counterclaims against the Plaintiffs VCL and VDSI as follows:

**A.    JOINT VENTURE AND REPUDIATION/BREACH OF FIDUCIARY RELATIONSHIP.**

A joint venture should be imposed on the parties' conduct. Such a relationship is a fiduciary relationship. VCL breached the joint venture, repudiated it and breached their fiduciary duty to him.

**B.    BREACH OF CONTRACT.**

VCL entered into assignment contracts in 2008 and 2011 with Barrett, and breached those contracts. *Id. para. 7.4*

**C.    BREACH OF IMPLIED COVENANTS.**

VCL entered into the 2008 and 2011 assignment contacts with Barrett and breached the implied covenant of good faith and fair dealing in those contracts. *Id. para. 7.5.*

**D.    FRAUD**

The Ventures have committed fraud. *Id. para. 7.8.* Punitive damages should be awarded.

## ARGUMENT.

**1.    A joint venture was formed**



MARY SCHULTZ LAW, P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

A joint venture arose from the parties' conduct. Such a relationship is a fiduciary relationship. VCL created a joint venture with Barrett, had a fiduciary duty to him, breached that duty, and repudiated that joint venture. *Second Amended Complaint. Doc 38, para. 7.2.*

The existence of a joint venture agreement is a question of fact to be determined by the preponderance of the evidence. *In re Yan*, 381 B.R. 747, 753 (N.D. Cal. 2007). Courts freely apply partnership law to joint ventures where it is appropriate, because the distinction between the two is not sharply drawn. Both relationships are virtually the same. *See In re Yan* at 753-54.

CACI 3712 lists the elements of a joint venture. A joint venture is an undertaking by two or more persons jointly to carry out a single enterprise profit. *In re Yan*, 38` B.R. at 753; *Weiner v. Fleischman*, 54 Cal.3d 476, 482 (1991); *Unruh-Haxton v. Regents of Univ. of Cal.*, 162 Cal.App.4th 343, 370 (2008). The law requires little formality in the creation of a partnership. A joint venture agreement is not invalid because it is indefinite as to details. *Id.* The joint venture may be formed by parol agreement, or it may be inferred from the acts and declarations of the parties. *Foster v. Keating*, 120 Cal.App.2d 435, 447, 261 P.2d 529 (1953); *In re Yan*, 381 B.R. at 753. It may be assumed as a reasonable deduction from those acts and declarations of the parties. *Scottsdale Ins. Co. v. Essex Ins. Co.*, 98 Cal. App. 4th 86, 91, 119 Cal.Rptr.2d 62 (2002).

"There are three basic elements of a joint venture: the members must have joint control over the venture (even though they may delegate it), they must share the profits of



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

the undertaking, and the members must each have an ownership interest in the enterprise." *Scottsdale Ins. Co.,* 98 Cal.App.4th at 91.

Parties in an employer/employee relationship, as here, can be joint venturers. The employee/employer relationship may exist for one purpose; but those same parties can be joint adventurers of partners for another purpose. *Nelson v. Abraham*, 29 Cal.2d 745, 177 P.2d 931 (1947). Moreover, the contributions of the respective parties need not be equal, or of the same character. *Id.* Even misunderstandings between the parties as to what the parties are to do with respect to profits do not prevent parties from having assumed the joint venture relationship. *Andrews v. Bush*, 109 Cal.App. 511, 517 (4th Dist. 1930).

As examples, where a defendant invented a certain apparatus, agreed to obtain patent rights, to assign those rights in exchange for the stock of a corporation to be formed, and to transfer to a plaintiff a percentage of those shares, such an agreement created the relationship of joint adventurers. *See Pacific Atlantic Wine, Inc. v. Duccini*, 111 Cal.App.2d 957, 245 P.2d 622 (1952).

Where two parties entered into (1) an undertaking to carry out a single enterprise for profit; (2) the parties respectively contributed and took on responsibilities, (3) distributed profits from the enterprise, even if varying and unequal; and (4) they intended a transfer and/or assignment of the ownership shares. The finding of a joint venture was supported. *See In re Yan*, 381 B.R. at 747.



MARY SCHULTZ LAW. P.S.
2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

Here, the joint venture was created, went on for years, and the agreements for consideration, i.e., the sharing of benefits and profits, were confirmed by assignment contracts in 2008, 2011, and 2012, when ownership transferred "for consideration."

**2.      Breach of Fiduciary Duty:**

A joint venture is a relationship involving fiduciary duty. *Foster v. Keating*, 120 Cal.App.2d at 445.  Once parties become joint venturers, they acquire rights, and subject themselves to duties, growing out of the fiduciary relationship they have created. *Foster*, 120 Cal.App.2d at 445. *Cleveland v. Johnson* (2012) 209 Cal.App.4th 1315, 1338 (0212) (stating that a joint venture is an example of a relationship that imposes a fiduciary obligation to act on behalf of and for the benefit of another).

A fiduciary duty is any relationship existing between parties to a transaction wherein one of the parties is in duty bound to act with the utmost good faith for the benefit of the other party.  Such a relation "ordinarily arises where a confidence is reposed by one person in the integrity of another, and in such a relation the party in whom the confidence is reposed, if he voluntarily accepts or assumes to accept the confidence, can take no advantage from his acts relating to the interest of the other party without the latter's knowledge or consent." *Wolf v. Superior Court* (2003), 107 Cal.App.4th 25, 29 (2003), *internal citations omitted.*  In this case, Mr. Barrett was induced by VCL to commit his complete and trusting personal confidence in VCL because he necessarily had to disclose his invention to VCL.  This was necessarily a relationship intended to be one of confidentiality, it furnished the basis for a



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

personal confidential relationship, and it imposed duties on VCL comparable to those that

inhere in a fiduciary relationship. *Foster v Keating* at 120 Cal.App.2d at 447.[11]  Barrett

relied on VCL's fiduciary role as a confidant, and as a joint venture partner.

VCL breached its fiduciary duty by accepting these confidences, then taking and

unilaterally retaining control of Barrett's inventions.

### 3.        **Breach of Contract.**

VCL entered into formal assignment contracts in 2008 and 2011 with Barrett, and

breached those contracts. *Id. para. 7.4.* Where parties contract with respect to patent

rights, the contract controls. *Mead Corp. v. U. S.*, 490 F.Supp. 405, 407-408, 208

U.S.P.Q. 205, *affirmed* 652 F.2d 1050, 209 U.S. App. D.C. 253, 211 U.S.P.Q. 491,

(D.C.D.C. 1980). CACI 200 *(Breach)*; 303 *(Element)*.

The only issue here is what was intended as the consideration exchanged between

Barrett and VCL in the 2008, 2011, and 2012 assignments.  This contract construction

issue is generally the role of the trial court. *Wolf v. Superior Court*, 114 Cal. App. 4th

1343, 1350-51, 8 Cal. Rptr. 3d 649 (2004) (where the court was required to interpret the

contractual phrase "gross receipts.")  In its analysis of the term, contracts must be

construed against the drafter—here, VCL.  The language of a contract "should be

---

[11]  Evidence of those conversations was also relevant to the issue framed by the allegations of the first complaint, and the denials of the answer, to the effect that defendant induced in plaintiff complete and trusting personal confidence in defendant's every word and deed.  That, if proved, would furnish a basis for an inference of a personal confidential relationship which would impose duties upon defendant comparable to those which inhere in a fiduciary relationship in the strict legal sense of the term.

*M*ARY
*S*CHULTZ
*L*AW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

interpreted most strongly against the party who caused the uncertainty to exist." Cal. Civ. Code § 1654; *Blackburn v. Allen*, 218 Cal. App. 2d 30, 34, 32 Cal.Rptr. 211 (1963).

Here, in the 2008, 2011 and 2012 (proposed) written assignment contracts with Barrett, VCL used a non-specific contract phrase, "good and valuable consideration" *intentionally*. Evidence shows that VCL specifically *excised* the very language it now claims was intended to be the contractual consideration. Because the 2003 Invention Agreement was intentionally excised from the contract, it cannot now be "returned" to the contract as the consideration contracted for. The contract is construed against VCL.

VCL's language is also "reasonably susceptible" to the interpretation that *Barrett* gives it—as Assignor, Barrett controlled and defined what consideration he was acknowledging for his patents. Moreover, there is no other "equally plausible interpretation" of the language of this contract. Per the motions in limine filed by Defendant Barrett, any construction of the later contracts which would return the excised 2003 Invention Agreement would also violate the parol evidence rule.

This court should hold as a matter of law on a directed verdict that the consideration contracted for in Barrett's assignments was the consideration of the joint venture. For well over a century, the consideration for an assignment may be in the form of a share in the profits made by the assignee. *Wilson v. Marlow*, 66 Ill. 385 (1872).[12] Consideration may be payments linked to subsequent business, and can vary in amounts

---

[12]   *See also Rude v. Westcott, Ind.* 9 S.Ct. 463, 130 U.S. 152, 32 L.Ed. 888 (1889); *Curry v. Charles Warner Co.*, 42 A. 425, 2 Marv., Del., 98 (1895).

MARY SCHULTZ LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

according to success achieved by the business. *Geolograph Co. v. Cities Service Oil Co.*, 251 F.2d 261, 266, 116 U.S.P.Q. 114 (C.A.10, Okla. 1958).   Alternatively, the jury may interpret the phrase. *See*, CACI 314 *(Interpretation – Disputed words)*; 315 *(Plain meaning)*; 317 *(Construction as a whole)*; 318 *(Construction by conduct)*; 319 *(Reasonable time)*; 320 *(Construction against the drafter)*.   The same law should be applied.

> **4.**   **Breach of implied covenant of good faith and fair dealing:**

When VCL entered into written assignment contracts with James Barrett on Dec. 17, 2008 and July 2011, it obligated itself to implied covenants of good faith and fair dealing, which it breached. *See* CACI 325 *(Elements)*.

Barrett performed his contractual duties by performing his share of the joint venture. But VCL breached its covenant of good faith and fair dealing by specifically *removing* language from contracts in 2008, 2011, and 2012 that it now asserts was a specific part of the parties' bargain.

Such an intentional act, followed by VCL's now contrary claim that the language it excised was intended to *be* the consideration, is a breach of good faith and fair dealing.

> **5.**   **Fraud/Concealment/Deception/Intentional Misrepresentation.**

Under California law, the indispensable elements of a fraud claim include a false representation, knowledge of its falsity, intent to defraud, justifiable reliance, and damages. *Vess v. Ciba-Geigy Corp. USA,* 317 F.3d 1097, 1105 (9th Cir. 2003); *In re Estate of Young,* 160 Cal.App.4th 62, 79, 72 Cal.Rptr.3d 520 (2008).   Fraud arises from



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

both affirmative conduct and material omission, *see, e.g.*, CACI VF-1901 *(Concealment)*; VF-1900 *(Intentional misrepresentation)*; VF-1902 *(False promises)*; VF-1908 *(Reasonable reliance)*.

    Here, Barrett's evidence will satisfy all elements, per the conduct described above.

### 6.    <u>Witnesses to be called.</u>

    James Barrett intends to present his own testimony, in addition to the testimony of Scott Hampton regarding Barrett's loss of the benefits of his bargain. He will present by deposition testimony VCL/VDSI witnesses, Kay Tat Ng and Alden Forbes. Plaintiffs have agreed to call VCL witness Lee Ghai Keen, and to allow questioning on cross outside the scope of direct. The number of exhibits in this case is extensive. Barrett expects that his case presentation will likely involve four to five days of testimony, depending on cross examination.

### 7.    <u>Damages:</u>

    Barrett's damage theory is encompassed in California jury instructions which include CACI 1924, the "benefit of the bargain" rule. Because this is a fiduciary relationship via a joint venture, and because Barrett alleges intentional misrepresentation, then "benefit of the bargain" damages are available. *See* CACI 1924, *Directions for Use*, citing, e.g., *Alfaro v. Community Housing Improvement System and Planning Ass'n, Inc.*, 171 Cal. App. 4th 1356, 1383 (2009). Barrett will be requesting those damages here.[13]

---

[13]  The measure of damages for this breach of fiduciary duty and joint venture is the amount which will compensate Barrett for all the detriment proximately caused him thereby, past, present, and future, whether it could have been anticipated or not. *Cal. Civ. Code §*

MARY SCHULTZ LAW, P.S.

2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

Under a lost profit theory, Barrett would also be proposing CACI 353, whereby he will show that he would have earned more profits but for the Ventures' breach of contract. It is in this regard that Scott Hampton's testimony will be essential. This case does not involve speculation. Barrett actively delivered certain commitments to VCL at their demand that he do so. Mr. Hampton has therefore valued the results of those contracts to their gross revenue and net profits.

### 8.    Punitive Damages:

Barrett has also made a claim for punitive damages. Punitive damages arise from breach of an obligation which does not arise from contract, where it is proven by clear and convincing evidence that the defendant has acted with despicable behavior, or has been guilty of oppression, fraud, *or* malice. Cal. Civ. Code § 3294, CACI 3945, VF-3900; *and see Ittella Foods, Inc. v Zurich Ins. Co., 98 F. App'x 689,690 (9th Cir. 2004).* Barrett's claims allege fraud, repudiation of a joint venture, and breach of fiduciary duty. ECF 21.

With claims of fraud and deceit, Barrett is entitled to show damages for pain and suffering. Cal. Civ.Code § 3333; *Von Grabe v. Sprint PCS*, 312 F. Supp.2d 1285, 1311 (S.D. Cal. 2003). Nominal damages alone will support punitive damages. *Sole Energy Co. v.*

---

*3333*. CACI 1924 provides for benefit of the bargain damages where there has been a fiduciary relationship and intentional misrepresentation. *Fragate v. Faulkner*, 110 Cal.App.4th, 229, 235-39 (2003); *Salahutdin v. Valley of Cal., Inc.*, 24 Cal.App.4th 555, 564 (1994), and *Alfaro*, 171 Cal.App.4th at 1383.

Barrett's share of consideration should be determined by benefit of the bargain damages—his share should be one-half of the value that he delivered to VCL between March 14 and March 20, 2013—the day they fired him. Whatever VCL has done since they fired him does not detract from the value of what was delivered.



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

*Petrominerals Corp.*, 128 Cal. App. 4th 212, 238, 26 Cal. Rptr. 3d 798, 818 (2005), *citing* Civ.Code, § 3294, *with other cites omitted.*

Evidence will be presented of the financial viability of Venture Corporation Ltd., on the third quarter of 2013, i.e., March 2013.   Barrett will be presenting publicly available materials which show Venture Corporation Ltd.'s financial status, admissible as statements of the opposing party.

### 9.   **Attorney Fees.**

The Ventures' effort to use and enforce their 2003 VDSI Invention Agreement is not warranted, Barrett's inventions did not transfer under that 2003 contract under its strict terms, assertion of the 2003 contract is prohibited by parol evidence, waiver, forfeiture, and estoppel, and the agreement is void.  If Barrett prevails on his claims, he is entitled to his reasonable fees under Cal. Civ. Code Sec. 1717.  In any action on a contract where the contract specifically provides for attorney's fees and costs incurred to "enforce" the contract, then such shall be awarded either to the prevailing party, whether he is the party specified in the contract or not. *Id.*

### 10.   **Miscellaneous.**

Barrett also reasserts his affirmative defenses here.  By motion in limine, Barrett has requested exclusion of the 2003 VDSI Employee Invention Agreement for any purpose.

**DATED** this 23rd day of April, 2015.

**MARY SCHULTZ LAW, P.S.,**

DEFENDANT/COUNTERCLAIMANT'S TRIAL BRIEF.doc - Page 26 of 34
CASE NO. CV 13-03384-PSG (ADR)



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**/s/MARY SCHULTZ**
Attorney for Defendant/Counterclaimant, CSB 231962
2111 E. Red Barn Lane, Spangle, WA 99031
Tel:  (509) 245-3522/ Fax: (509) 245-3308
E-mail: Mschultz@Mschultz.com

DEFENDANT/COUNTERCLAIMANT'S TRIAL BRIEF.doc - Page 27 of 34
CASE NO. CV 13-03384-PSG (ADR)



## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of **April, 2015**, I electronically filed the foregoing document with the Clerk of the United States District Court for the Northern District of California, using the CM/ECF System, which will thereby serve and send notification of such filing to all registered attorneys in the above action.

   **DATED** this 23rd day of **April, 2015**.

   **MARY SCHULTZ**

   **/s/Mary Schultz**
   Attorney for Defendant/Counterclaimant, CSB 231962
   2111 E. Red Barn Lane, Spangle, WA 99031
   Tel:  (509) 245-3522  Fax: (509) 245-3308
   E-mail: MSchultz@MSchultz.com



2111 E. Red Barn Lane
Spangle, WA 99031
Phone: 509.245.3522 • Fax: 509.245.3308